JUDGE GRIESA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

10 CIV 3240

RECEIVED
APR 16 2010
U.S.D.C. S.D. N.Y.
CASHIERS

-------------------------------------------------------X

AMEROPA AG,

                    Plaintiff,

    - against -

HAVI OCEAN CO. LLC,

                    Defendant.

10 Civ.

ECF CASE

-------------------------------------------------------X

## COMPLAINT

Plaintiff, AMEROPA AG (hereinafter referred to as "Plaintiff"), by and through its

attorneys, Lennon, Murphy & Lennon, LLC, as and for its Complaint against the Defendant,

Havi Ocean Co. LLC (hereinafter referred to as "Defendant"), alleges, upon information and

belief, as follows:

      1.      This matter arises under the Court's federal question jurisdiction within the

meaning of 28 United States Code § 1331 and the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the Federal Arbitration

Act (9 U.S.C. § 1 *et seq.*).  Plaintiff seeks the recognition, confirmation, and enforcement of an

arbitration award rendered in its favor as against Defendant by the Arbitration Tribunal of the

Chamber of Commerce of Hamburg decreed on March 25, 2009.

      2.      At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under the laws of Switzerland, with a principal place of business

located in Binningen, Switzerland.  Plaintiff was in the business of *inter alia* purchasing

sulphuric acid in bulk.

3.      Defendant was, and still is, a foreign corporation or other business entity organized and existing under the laws of the United Arab Emirates, with a principal place of business located in Dubai, U.A.E.  Defendant was in the business of *inter alia* selling sulphuric acid in bulk.

4.      This Court has personal jurisdiction over Defendant by virtue of Defendant's registration with the New York State Department of State as a foreign limited liability company authorized to conduct business in New York.  Defendant has appointed an agent for service of process within the Southern District of New York.  *See New York registration information for Defendant as of April 15, 2010 attached as Exhibit "1".*

5.      By Purchase Contract no. PU-005896 dated August 2, 1997, Plaintiff agreed to purchase and Defendant agreed to sell approximately 18,000 metric tons of sulfuric acid in two lots of 9,000 metric tons each.  The contract price was $142 per metric ton.  The Purchase Contract provided that any disputes shall be decided in arbitration according the rules of the Chamber of Commerce in Hamburg, Germany.  *A copy of the Purchase Contract is attached hereto as Exhibit 2.*

6.      Defendant delivered one lot of 9,000 metric tons to Plaintiff but breached the Purchase Agreement by failing to supply a disputed second lot of the same quantity.  Plaintiff suffered damages as a result.

7.      Disputes arose and Plaintiff instituted arbitration proceedings against Defendant before the Arbitration Tribunal of the Chamber of Commerce of Hamburg in strict accordance with the arbitration clause contained in the Purchase Agreement.  In the arbitration, Plaintiff claimed that Defendant had breached the Purchase Agreement by failing to deliver the second lot of 9,000 metric tons of sulphuric acid.  Defendant appeared, defended and cross-claimed in the

2

Hamburg arbitration through counsel. The arbitration tribunal considered the parties' evidence and conducted oral proceedings.

8.    On March 25, 2009, the arbitration tribunal issued its Arbitration Award in favor of Plaintiff and against Defendant in the principal amount of EUR 720,216.03. More specifically, the arbitration tribunal found that Plaintiff had suffered damages in the amount of EUR 676,605.63 as a result of Defendant's failure to deliver 9,000 mts of sulphuric acid and also found that Plaintiff had suffered damages of EUR 43,610.40 in respect of lost profits. Additionally, the arbitration tribunal awarded Plaintiff interest at the rate of prime plus 5% as from June 17, 2008 on the amount of EUR 676,605.63 and as of December 1, 2007 on the amount of EUR 43,610.40. Further, the arbitration tribunal awarded Plaintiff 95% of the costs of arbitration and extrajudicial costs. *A true and accurate copy of the Arbitration Award is annexed as Exhibit 3.*

9.    Despite due demand, Defendant has failed and/or refused to pay any portion of the outstanding Arbitration Award.

10.    Inclusive of unpaid interest and costs that the arbitration tribunal awarded to Plaintiff, Defendant is liable to pay Plaintiff EUR 852,809.82 pursuant to the March 25, 2009 arbitration award. Interest on the unpaid Arbitration Award continues to accrue.

11.    Defendant has twice unsuccessfully attempted to appeal the Arbitration Award in the courts of Germany. It first appealed to the Hanseatic Upper District Court of Hamburg, Civil Division 13, wherein the court held that the Arbitration Award was enforceable and that Defendant was ordered to pay Plaintiff's costs associated with the appeal. *See Hanseatic Upper District Court Order dated September 15, 2009 with German to English translation annexed as Exhibit 4.* Defendant subsequently appealed to the Federal Court of Justice Bundesgerichtshof

(effectively the German Supreme Court) only to voluntarily withdraw that appeal. The Federal Court of Justice held that Defendant had exhausted all appeals as to the validity of the arbitration award and stated "[h]aving withdrawn its appeal against the court order passed by the Hanseatic Upper District Court of Hamburg, Civil Division 13, on September 15, 2009...the Petitioner [Defendant] is hereby deprived of this remedy." Plaintiff was awarded its costs incurred in defending against Defendant's two German court actions. Defendant is liable to pay Plaintiff EUR 13,161.28 in costs in relation to defending against Defendant's two appeals filed with the German courts.

12.     Plaintiff petitions this Court to recognize, confirm and enforce the final Arbitration Award as a judgment of this Court pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, Chapter Two of the Federal Arbitration Act, 9 United States Code §§201-208.

13.     Plaintiff further petitions this Court to recognize, confirm and enforce the foreign judgments of the Hanseatic Upper District Court and Federal Court of Justice pursuant to the doctrine of comity and/or Article 53 of the New York Civil Practice Law and Rules, N.Y. C.P.L.R. §5301 et seq.

14.     Based on the foregoing, Plaintiff prays that judgment issue against Defendant in the amount of EUR 865,970.86 (U.S. $1,175,847.24) plus an award of interest and costs associated with bringing the instant action.

**WHEREFORE**, Plaintiff prays:

A.      That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint, failing which default judgment be entered against it;

B.      That pursuant to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*) and/or the doctrine of comity and/or Article 53 of the New York Civil Practice Law and Rules, N.Y. C.P.L.R. §5301 *et seq.* this Court recognize, confirm and enforce the final arbitration award and foreign court judgments rendered on the claims had herein as a Judgment of this Court in the amount of U.S. $1,175,847.24;

C.      That this Court retain jurisdiction over this matter through the entry of any judgment and issue any and all orders necessary for Plaintiff to enforce its Judgment against Defendant's property;

D.      That this Court award Plaintiff the attorneys' fees and costs incurred in this action;

E.      That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated: April 16, 2010

<div style="margin-left:40%">

The Plaintiff,
AMEROPA AG

By: *Charles E. Murphy*
Charles E. Murphy
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
cem@lenmur.com

</div>

# Exhibit 1

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through April 15, 2010.

Selected Entity Name: HAVI OCEAN CO. (L.L.C)
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | HAVI OCEAN CO. (L.L.C) |
| **Initial DOS Filing Date:** | MARCH 05, 2009 |
| **County:** | NEW YORK |
| **Jurisdiction:** | UNITED ARAB EMIRATES |
| **Entity Type:** | FOREIGN LIMITED LIABILITY COMPANY |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O CT CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Registered Agent**

C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

This office does not require or maintain information regarding the names and addresses of members or managers of nonprofessional limited liability companies. Professional limited liability companies must include the name(s) and address(es) of the original members, however this information is not recorded and only available by viewing the certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

\*Stock information is applicable to domestic business corporations.

## Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| MAR 05, 2009 | Actual | HAVI OCEAN CO. (L.L.C) |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results                                    New Search

Services/Programs    |    Privacy Policy    |    Accessibility Policy    |    Disclaimer    |    Return to DOS Homepage    |    Contact Us    |    Web Feedback

# Exhibit 2

# AMEROPA
### AKTIENGESELLSCHAFT

## PURCHASE CONTRACT NO. PU-005896
### Hamburg, 2nd August 2007 / tf

We are pleased to confirm your sale / our purchase concluded 2nd August 2007 on basis of and
subject to our general conditions of sale and delivery to you as follows:

| | |
|---|---|
| Seller: | Havi Ocean Co. (L.L.C) <br> Office 204, Al Rais building <br> SK. K. Bin Zayed road <br> Opp. Burjuman <br> P.O. Box 29061 <br> Dubai, U.A.E. |
| Buyer: | AMEROPA AG <br> Rebgasse 108 <br> CH-4102 Binningen <br> Switzerland |

**Product:**  SULPHURIC ACID
*Specifications*

| PROPERTY | UNITS | VALUE |
|---|---|---|
| PURITY: | WT% | 98.00 MIN |
| CALCINATION RESIDUE: | WT% | 0.01 MAX |
| ARSENIC: | WT% | TRACE |
| SO2: | WT% | 0.0025 MAX |
| HG : | WT% | TRACE |
| TURBIDITY: | N.T.U | 100 MAX |

| | |
|---|---|
| Packing: | in bulk |
| Quantity: | 18.000 mts +/- 5 % shipping tolerance in buyer's option <br> (in 2 lots of 9.000 mts +/- 5 % each) |
| Price: | USD 142,00 pmt CFR Puerto Cabello, Venezuela |
| Shipment | 1st lot with loading l/c 3—7 September 2007. *October* <br> 2nd lot with loading l/c 17—21 September 2007 *November* |
| Origin: | Iran |
| Destination: | Venezuela |
| Payment: | By telegraphic transfer of funds for full invoice value to seller's account with Emirates bank international PJSC, Alsouk branch, Dubai – U.A.E. upon receipt of the original shipping documents. |
| Documents: | - commercial invoice, 1 original and 1 copy <br> - 3/3 full set Bills of Lading or Mate's Receipt in buyer's option <br> - certificate of origin <br> - certificate of quality and analysis issued by an independent surveyor <br> - certificate of quantity issued by an independent surveyor <br> - certificate of hold cleanliness issued by an independent surveyor |

HEAD OFFICE: AMEROPA, REBGASSE 108, CH-4102 BINNINGEN, MAILING ADDRESS: P.O. BOX, CH-4015 BASEL
PHONE: 061- 301 27 11, FAX: 061- 302 98 63, TELEX: 962 129, AME CH, E-MAIL: INFO@AMEROPA.COM

HAVI
Havi Ocean Co ( L.L.C. )

# AMEROPA
### AKTIENGESELLSCHAFT

| | |
|---|---|
| **Quality / Quantity:** | Independent certificates of weight and product analysis issued at loadport by an international recognized independent inspection company will govern and to be final for both parties and to be for Seller's account. Specification as per Appendix - A . |
| **Marine Terms:** | a) All marine terms as per governing charter party including DEM/DES. |
| | b) DEM/DES calculation to be presented and settled within 60 days after completion of discharging / loading. |
| | c) Discharge rate: 80 mts per hour SHINC |
| **ISPS Clause :** | (A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel, the Owners shall confirm that the vessel and "the company" (as defined by the ISPS code) shall comply with the requirements of the ISPS Code relating to the vessel and "the Company". Upon request the Owners shall provide a copy of the relevant international ship security certificate (or the Interim International Ship Security Certificate) to the Seller. The Owners shall provide the seller with the full style contact details of the Company Security Officer (CSO). |

(ii) Except as otherwise provided in the contract of sale, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS code and this Clause shall be for The Owners' account.

(B) (i) The Seller shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners may require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Sellers to comply with this Clause shall be for Sellers account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by Owner's failure to comply with their obligations under the ISPS code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS code shall count as laytime or time on demurrage if the vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Seller at the demurrage rate.

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS code including, but not limited to, security guards, launch services, tug escorts, port security fees or

HEAD OFFICE: AMEROPA, REBGASSE 108, CH-4102 BINNINGEN, MAILING ADDRESS: P.O. BOX, CH-4015 BASEL
PHONE: 061- 301 27 11, FAX: 061- 302 98 63, TELEX: 962 129, AME CH, E-MAIL: INFO@AMEROPA.COM

2

HAVI
Havi Ocean Co. ( L.L.C. )

# AMEROPA
### AKTIENGESELLSCHAFT

taxes and inspections, shall be for the Sellers' account, unless such costs or expenses result solely from the Owner's negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for Owner's account.

(E) If either party makes any payment, which is for the other party's account according to this clause, the other party shall indemnify the paying party.

| | |
|---|---|
| **Incoterms:** | Unless otherwise specified Incoterms 2000 plus subsequent revisions apply. |
| **Disputes:** | Any dispute in the interpretation and/or execution of this contract to be settled in an amicable way. If an amicable solution of the problem is impossible, both parties agree on arbitration according to the rules of the Chamber of Commerce in Hamburg, Germany and their findings will be final and binding for both parties. |
| **Force Majeure:** | This contract is contingent upon the Parties (Seller and/or Buyer) not being held liable for delay, failure to ship or loss of any shipment or part thereof, caused by strike, fires, pestilence, riots, civil, commotion, war, hostilities or war like actions, restraint or compulsion or interference of government or governmental agencies, force majeure or other conditions beyond the reasonable control of the Parties. |
| | In the event of such contingencies arising, the Parties shall be released from their obligations to the event that such conditions prevent or impair performance or impose unreasonable demands or disproportionate commercial or other sacrifices or expenses upon the Parties in order to fulfill the contract. |
| | It is an integral part of this contract that the Parties shall be in no way liable for restrictions or consequences of legislation imposed by the EEC Commission that prevents the performance of this contract. |
| **Warranty:** | Unless otherwise specified, Sellers warrant that the goods will be fit for ordinary purposes for which such goods are normally used. Sellers do not warrant that goods are suitable for any particular purpose for which they may be required, whether or not Sellers have reason to know of any such requirements. There are no warranties which extend beyond the description of the face hereof. |
| **Entirety:** | The entire contract between the parties is contained in this written agreement, and no representation nor oral agreement nor understanding not contained in this contract shall affect or alter same. |
| **Confidentiality:** | Buyers and Sellers agree to consider this contract as fully confidential and agree not to disclose any of its content to any third party. |
| **Special clause:** | In case the countersigned copy of this contract has not been returned to Sellers within 5 days after receipt of this contract by Buyers, it is assumed by both parties that all terms and conditions of this contract have been accepted. |

HEAD OFFICE: AMEROPA, REBGASSE 108, CH-4102 BINNINGEN, MAILING ADDRESS: P.O. BOX, CH-4015 BASEL
PHONE: 061-301 27 11, FAX: 061-302 95 63, TELEX: 962 129, AME CH, E-MAIL: INFO@AMEROPA.COM

3

HAVI
(Jan Chase Co. / L.L.C. )

# AMEROPA
### AKTIENGESELLSCHAFT

We thank you for this business and are looking forward to its smooth execution. May we ask you to return us one copy duly countersigned by you to our address either by mail or by fax.

FOR THE BUYER                          FOR AND ON BEHALF OF THE SELLER
On behalf and for account of           HAVI OCEAN CO. (L.L.C)
AMEROPA AG

**AMEROPA**
Düngemittel GmbH

                                       HAVI
                                       Havi Ocean Co. (L.L.C.)

NOTE: Specification to read as attached (Appendix A).

HEAD OFFICE: AMEROPA, REBGASSE 108, CH-4102 BINNINGEN, MAILING ADDRESS: P.O. BOX, CH-4015 BASEL.
PHONE: 061- 301 27 11, FAX: 061- 302 98 63, TELEX: 962 129, AME CH, E-MAIL: INFO@AMEROPA.COM

4

# APPENDIX A

## SPECIFICATIONS FOR SULPHURIC ACID

### CHEMICAL PROPERTIES

| | |
|---|---|
| H2SO4 | 98%   MIN |
| RESIDUE ON IGNITION | 0.20 % |
| IRON | 0.05% |
| LEAD | 0.005% |

### PHYSICAL PROPERTIES

| | |
|---|---|
| SPECIFIC GRAVITY | 1.82 – 1.84 |
| COLOUR | COLOURLESS |

HAVI

# Exhibit 3

*Certified Translation from the German Language*

# Arbitration Award

passed by the

## Arbitration Tribunal of the Chamber of Commerce of Hamburg

### in the legal dispute of

### Ameropa AG ./. Havi Ocean Co. (L.L.C.)

Hamburg, on this 25th of March, 2009

In the legal dispute of

**Ameropa AG**,
represented by Felix Zivy, Andreas Zivy, Marcus Damman, Charles Waffenschmidt, Jan Kadanik
and Nicole Miescher-Zivy, its Board of Directors,
Rebgasse 108,
CH-4102 Binningen, Switzerland,

Attorneys of record:
Lehmann, Attorneys at Law,
Hamburg,


v e r s u s


**Havi Ocean Co. (L.L.C.)**,
represented by Saeed Daneshmand, its managing director,
Office 204, Al Rais Building,
SK. K. Bin Zayed Road, Opp. Burjuman,
P.O. Box 29061,
Dubai, United Arab Emirates,

Attorneys of record:
Dabelstein & Passehl, Attorneys at Law,
Hamburg,

oral proceedings were held on January 15, 2009 by the arbitrators Ulf Becker, Axel Bartels and Dr.
Johannes Trappe (chairman) and statements of case were exchanged between the Parties and, on
said basis, the Arbitration Tribunal of Hamburg of the Chamber of Commerce of Hamburg HELD
DECREED AND DETERMINED on March 25, 2009 as follows:

**The Respondent is sentenced to pay to the Claimant an amount of EUR 720,216.03
(sevenhundredandtwentythousand and twohundredandsixteen Euros and three Cents).**

**In addition, the Respondent is sentenced to pay to the Claimant the following interests
per annum: on the amount of EUR 676,605.63, the applicable basic interest rate plus
5% as from June 17, 2008, and on the amount of EUR 43,610.40 the applicable basic
interest rate plus 5% as from December 1, 2007, in both cases, however, not more than
8%.**

**And finally, the Respondent is sentenced to bear 95% of the costs of the arbitration
proceedings and the extrajudicial costs while the Claimant shall bear 5% of said costs.**

**The further claims forming a subject matter of the statement of claim as well as the
interest claims asserted by the Respondent are dismissed.**

**The value in dispute amounts to EUR 758,904.40.**

The Court's reasons for this decision can be derived from the following facts and the reasons for
the decision described thereafter.

ARBITRATION TRIBUNAL OF THE CHAMBER OF COMMERCE OF HAMBURG
Ameropa AG ./. Havi Ocean Co. (L.L.C.)

Page 3 of 15

## Facts of the Case

### Introduction

The International Petrochemical Sales Ltd. (IPSL), a Venezuelan company, intended to purchase two lots of sulphuric acid and approached Ameropa AG, Binningen, Switzerland, the Claimant, in order to find out whether said company was able to deliver said lots. The Claimant, represented by its subsidiary Ameropa Düngemittel GmbH, Hamburg, declared to be willing to deliver always provided, however, that it was able to stock up correspondingly. The Respondent - Havi Ocean Co. (L.L.C.), Dubai - offered to act as supplier. Contracts were executed. The Respondent delivered one lot of 9,000 mts to the Claimant but failed to supply a disputed second lot of the same quantity. For this reason, the Claimant instituted arbitration proceedings before the Arbitration Tribunal of the Chamber of Commerce of Hamburg and asserted claims for damages, arguing that the Respondent would have had to deliver the second lot of 9,000 mts, too - something which is disputed by the Respondent. By way of a counterclaim, the Respondent demands payment of laytime charges as incurred during the shipment of the first lot.

### Undisputed Facts

In summer of 2007, IPSL and the Claimant held negotiations about the delivery of two times 9,000 mts. On August 1, 2007, IPSL submitted a firm offer to the Claimant that was to be confirmed by the latter. Anyhow, the Claimant and the Respondent signed their purchase contract no. PU-005896 on August 2, 2007 (Annex C1). On the same day, the Claimant executed its contract with IPSL (Annex C2) that was signed and returned to the Claimant by IPSL on August 14.

Both contracts have substantially been concluded on a back-to-back-basis, except for, *among other aspects*, the purchase price. Accordingly, the delivery quantity set forth in both contracts amounts to "18,000 mts +/-5% shipping tolerance in buyer's option (in 2 lots of 9,000 mts +/-5% each)", and with respect to the IPSL contract, in each case "+/10%". The delivery price between the Parties of this dispute amounts to "USD 142.00 pmt CFR Puerto Cabello Venezuela", and under the IPSL contract to "USD 149.00 pmt CFR PO Puerto Cabello". The first contract (Annex C1) states "Iran" as "Origin", the second contract (Annex C2) states "Iran and/or India" as "Origin". The delivery dates initially set forth in the contract between the Claimant and the Respondent were "1st half of September" and "2nd half of September", but in the contract submitted as Annex C1, it was then undisputedly changed to "1st lot with loading l/c October 2007, 2nd lot with loading l/c November 2007". The IPSL contract (Annex C2) mentions the initial date of shipment. In addition, the contract executed between the Parties includes the following arbitration clause (btw. as it is the case with the IPSL contract):

> "Disputes:
> Any dispute in the interpretation and/or execution of this contract to be settled in an amicable way. If an amicable solution of the problem is impossible, both parties agree on arbitration according to the rules of the Chamber of Commerce in Hamburg, Germany and their findings will be final and binding for both parties".

And finally, the contract submitted as Annex C1 (similar to the contract submitted as Annex C2), includes the following

> "Marine Terms:
> a)  All marine terms as per governing charter party including DEM/DES.
> b)  DEM/DES calculation to be presented and settled within 60 days after completion of discharging/loading.
> c)  Discharge rate: 80 mts per hour SHINC."

On September 3, 2007, Mrs. Abeer Shams, an employee of the Claimant in Cairo, received the following letter from the Respondent (Annex C3):

"We are trying for a quantity of 15,000 MTs, to complete the total contract in one shipment, from Hindalco with the same specifications as provided earlier, from Sterlite. Shipment would be effected around 21st Sept '07 to reach the discharge port in Venezuela by the end Oct. The vessel will be nominated in a couple of days."

On the same day, Mrs. Shams replied to the Respondent (Annexes C4 = SB1):

"I have advised Hamburg office (the subsidiary of the Claimant) that we will nominate a 15000 mt vessel today, shipt end Sept and same info was conveyed to Venezuelans who were very happy to hear such news. As agreed I am waiting for your nomination today asap."

Also on September 3, 2007, the Respondent advised Mr. Shams in writing (Annex SB2):

"… Vessel Nomination-Venezuela Shipment:
Importance High
Dear Madam,
For MT ALESSANDRO DP,
LOA: 138.11 m
Beam: 23m
Draft: 9.40m
Thanks and Best Regards …".

Again on the same day, IPSL wrote to Mrs. Shams (Annexes C5 = SB11):

"As per our telcon moments ago, pls note that vessel itself would be accepted by receivers (except disrate must be 80 mts per hour) but we definitely need to load maximum 9.000 mts. Seeing Havi can swap our and EFIC's cargoes then the possibility to load only 9kt by end Sept for us and the balance 6kt to ship it beg Oct together with our original 9kt (i.e. total 15kt) for EFIC should be workable as well especially in view of present production problems then loading less qtty in the beginning shud be better fr suppliers. Storage capacity in destination is unfo limited to 9kt (despite receivers continued efforts to receive up to 13kt). On the other hand, if there are any other background reasons that Havi is reticent to ship us 9kt in end Sept (i.e. to mitigate some losses) then we would like to know abt to analyze further.
Abeer: the results of being blacklisted by the Venezuelians can have devastating effects fr our overal strategy in latin America.
We absolutely need Havi's agreement/support ot laod only m9kt fr end sept shipment. Pls kindly discuss over with mr daneshmant and revert back urgently with his reply, and as discussed we will highly appreciate if he can accept our invitation to him to come to Hamburg on Wednesday to discuss further."

Mrs. Shams forwarded said message to the Respondent (Annex SB11).

Three days later, on September 6, 2007, the Respondent informed the Claimant about the nomination of MS "Havi Ocean" for 9,000 mts. IPSL accepted said nomination without any delay. On September 12, 2007, said nomination was replaced by the ship "Stolt Ami" which was again immediately confirmed by IPSL. On said ship, 9,000 mts were loaded on September 27; it arrived in Puerto Cabello on October 31 with discharge works being completed on November 8.

A dispute arose whether the Respondent was to deliver the second 9,000 mts of sulphuric acid. On October 11, the Parties discussed the state of affairs in Zurich in order to find an amicable solution. In the course of said discussion, however, the Respondent denied to be obliged to deliver the second lot of sulphuric acid. The meeting remained without any result.

On October 17, the Respondent offered the Claimant to deliver to it 9,000 mts during the second half of November at a price of USD 250 per ton (instead of USD 142/mt) (Annex SB8); the Claimant, however, refused said offer.

In the meantime, it had come to the Claimant's knowledge that the Respondent had contracted the tanker "Sanmar Majesty" for 10,000 mts +/-5% sulphuric acid, loading port India/port of discharge

option Walvis Bay (Namibia) or Puerto Cabello (Venezuela), time of discharge "first half-mid November 2007". Upon its request, Lloyd's Intelligence Bureau confirmed that 9,535,306 mts would in fact have had been loaded on said tanker in India on November 17 and discharged in Walvis Bay on December 9 (Annex C6).

This was followed by some correspondence between the Claimant's and the Respondent's attorneys of record and, later, with the lawyer in Dubai (Annexes C7 - C12) in which both Parties continued to persist in their viewpoints.

<u>The Claimant's Submission</u>

In the Claimant's opinion, the Respondent is in breach of the contract because it had unjustly refused to deliver the second lot of 9,000 mts of hydrochloric [sic] acid. The reason for said refusal had been the considerable price increase on the chemicals market. The agreement to deliver a total of not more than 15,000 mts or even not more than 9,000 mts, as it was alleged by the Respondent, had never been made.

The Claimant describes in more detail that it had negotiated a contract with IPSL in June and July of 2007; said contract had been confirmed by IPSL on August 1 under the condition that the Claimant's confirmation was given, too. Said confirmation, so the Claimant, had initially been sent by it to the Respondent on August 2 for information and accepted by the latter on the same day. Again on the same day, the Claimant had forwarded the purchase contract submitted as <u>Annex C1</u> to the Respondent who, in turn, had signed and returned it on August 20. On August 3, the Claimant had drawn up the contract submitted as <u>Annex C2</u> and sent it to IPSL who signed and returned said contract on August 14.

The Claimant continues that the Respondent had been confronted with delivery problems but failed to submit any documents giving evidence as provided for in the purchase contract, <u>Annex C1</u>, under the section "Force Majeure". (This is undisputed.) On September 3, the Respondent had sent the letter submitted as <u>Annex C3</u> to the Claimant's employee working in Cairo, namely Mrs. Abeer Shams, stating that a delivery quantity of 15,000 mts should "complete the total contract in one shipment". By a letter according to <u>Annex C4</u>, Mrs. Shams had, as a rule, welcomed said proposal, so the Claimant, but at first forwarded it to Hamburg because such a fundamental modification proposal was, in the first instance, subject to the acceptance by the final customer IPSL. IPSL, however, had refused to accept said proposal but insisted on a delivery of two partial quantities of 9,000 mts each because - due to the limited warehousing capacities in Puerto Cabello - it was only possible to discharge 9,000 mts at a time and thus, a total of 18,000 mts were to be delivered. This is what the Respondent had been informed about by Mrs. Shams (<u>Annex C5</u>).

On September 6, 2007, the Respondent had nominated the tanker "Havi Ocean" for 9,000 mts (<u>Annex C2</u>) and thus, obviously dropped its former proposal of a shipment in the amount of 15,000 mts on the tanker "Alessandro DP". According to the Claimant, the tanker "Havi Ocean" had not been a replacement for "Alessandro MP". On September 12, MT "Havi Ocean" had then, for 9,000 mts, been replaced by the tanker "Stolt Ami". Said ship had been loaded on September 27. Mrs. Shams had not been authorized to change the contract, as it had been misunderstood by the Respondent.

The Claimant continues to submit that, on October 1, the Respondent had given notice of the possibility to load 7,000 mts to 8,000 mts about the end of October/beginning of November. But such a quantity, so the Claimant, would have had caused problems with IPSL.

According to the Claimant's statements, the Respondent had then disputed to owe the delivery of a second quantity of 9,000 mts during the meeting held in Zurich on October 11; the Respondent is said to have justified its point of view by saying that the Claimant had refused a delivery in the amount of 15,000 mts and had thus forfeited the right to receive a second lot. The Claimant, however, admits that the Respondent had declared its willingness to support the Claimant with

another unloading under market conditions. On October 17, the Respondent had offered 9,000 mts at a price of USD 250/mt (instead of USD 142/t, as agreed upon; cf. Annex SB8). The Claimant reports to have refused said offer. Had it accepted this offer, so the Claimant, it would have had incurred procurement expenses of USD 1,044,000, which, if added to its lost profits, would have had increased its damage in addition to its claim by another USD 7,000.

The shipment of "10,000 mts +/- 5% on board of MT "Sanmar Majesty" (Annex C6) demonstrates, in the Claimant's opinion, that the Respondent had failed to make the second delivery to the Claimant against the background of the increased price for sulphuric acid. In the course of further efforts to reach an amicable solution, the Claimant's attorney at law had requested the Respondent to fulfill the contract or, in case of failure to do so, to order another party for stocking up (Annex C7).

The correspondence that followed between the Parties failed to be successful (Annexes C8, C9, C10). According to the Claimant's statements, it ended with a letter sent by the Claimant on November 8, 2007, by means of which it terminated the contract without further notice (Annex C11). The Respondent had given a response (Annex C12) and agreed to Hamburg as place of jurisdiction for arbitration proceedings.

The Claimant estimates the damage incurred by it due to the breach of contract to a total of EUR 758,904.40, that means to EUR 715,294.00 as damages paid to IPSL plus lost profits in the amount of EUR 43,610.40, if converted.

The Claimant continues to submit that only after a great deal of efforts it had succeeded in reducing the claims for damages asserted by IPSL in the original amount of USD 1,692,900.00 (Annex C13) to USD 1,100,000.00 (Annex C14). The corresponding invoice issued by IPSL (Annex C15) in the amount of EUR 715,294.00, if converted, (C17) had been settled by it on June 16, 2008 (Annex C16). In addition, the Claimant demands a compensation for lost profits in the amount of USD 63,000.00 (9,000 mts à USD 149/mt according to the contract submitted as Annex C2 less USD 142/mt according to the contract submitted as C1 = USD 7,000/mt), resulting in EUR 43,610,40, if converted (Annex C18). The resulting sum, so the Claimant, amounts to EUR 758,904.40.

To substantiate its claim for damages, the Claimant, in particular, relies on emails exchanged with some companies which, in its opinion, give evidence that it had made efforts to reduce the damage and that such efforts had been in vain (Bundle of Annexes C20). The Tribunal will elaborate on this when stating its reasons for the decision.

In any other respect, the Arbitration Tribunal makes reference to the statements of case filed by the Claimant.

Consequently, the Claimant applies

> to sentence the Respondent to pay to it an amount of EUR 758,904.40 together with 8% annual interests, namely as from November 1, 2007 on the amount of EUR 43,610.40 and as from June 16, 2008 on the amount of EUR 715,294.00, and to bear the costs of the proceedings.

## The Respondent's Submission

The Respondent applies

> to dismiss the claim

and by way of an alternative counterclaim,

> to sentence the Claimant to pay to it an amount of USD 55,889.60 together with interests at a rate of 8% percentage points above the basis interest rate as from November 29, 2007,

and

> to sentence the Claimant to bear the costs of the arbitration proceedings.

The Respondent submits as follows:

It has, *among other things*, been dealing with chemicals and in July 2007, it had agreed upon the delivery of 130,000 mts sulphuric acid with an Indian producer, supposed to be supplied by several equal partial deliveries. After execution of said delivery contract, it had concluded the contract submitted as Annex C1 with the Claimant. In the midst of August, so the Respondent, the producer had informed it to be unable to deliver due to production problems. Therefore, it had not received any deliveries from said producer. Then, it had been offered a delivery of 15,000 mts, loading at the end of September 2007 and delivery in Puerto Cabello at the end of October, from another Indian producer. The Respondent submits to have offered said delivery to the Claimant on September 3 and, as it could be derived from the correspondence, the Claimant had accepted said offer (Annexes C3, C4 = SB1). In said correspondence, the Claimant had asked to nominate the relevant ship. In reply to said request, it had informed the Claimant about the nomination of MT "Alessandro MP" (sic) for the quantity of 15,000 mts agreed upon. The Respondent is of the opinion that Mrs. Shams had acted with binding effect in that connection, and in any case, with agency of estoppel.

The Respondent continues to submit that it had, of course, been aware that the Claimant itself was a dealer only, that means not the user of the commodity, but that it had not been informed about a precise contract, its conditions and the actual customer at any time. The Respondent denies the contrary submission of the Claimant and says that it had never been aware of a need to obtain a consent from a third party. Annex C4 = SB1, so the Respondent, speaks for itself as it includes an explicit reference to the fact that both the "Hamburg office" and the "Venezuelans" had been informed and given their consents. Consequently, the Venezuelan customer of the Claimant had been given notice prior to the acceptance of the offer and had agreed to the change of the contractual conditions. In the Respondent's opinion it is evident that the assertion according to which the Claimant's customer had insisted to receive two deliveries of 9,000 mts each is not true. Whether said customer possibly changed its decision at a later time, is something the Respondent does not know according to its statements. The submission of the Claimant pursuant to which the Claimant's customer had not been willing to waive 50% of the delivery is, in the Respondent's opinion, incomprehensible because a change of the contract from 18,000 mts to 15,000 mts was equal to a reduction by not more than about 7.4%. And apart from all that, it had been possible to derive from the Claimant's email of the same day (September 3) that the latter had accepted the nominated ship.

Then, by email of September 3, the Claimant, for its part, had also requested another change of the contract with the effect that a delivery of only 9,000 mts rather than 15,000 mts was to take place because of a lack of warehousing capacities (Annex C5, not: Annex C6). Complying said request, so the Respondent, it had nominated MT "Havi Ocean" instead of MT "Alessandro MP" that had later been replaced by MT "Stolt Ami" (Annex SB3). The Respondent states that the Claimant had not raised any objections in said context.

ARBITRATION TRIBUNAL OF THE CHAMBER OF COMMERCE OF HAMBURG
Ameropa AG ./. Havi Ocean Co. (L.L.C.)

Page 8 of 15

By email of October 17, 2007 (in the Respondent's statement of case dated October 24, 2008, the Parties have been confused in the midst of page 8), the Respondent had offered the Claimant to deliver a lot of 9,000 mts at a price of USD 250/mt (Annex SB8), something what the Claimant had refused to accept. In addition, so the Respondent, it had submitted a counter-offer with the Claimant including a price of USD 142 plus a non-recurring payment of USD 500,000. In its opinion, all this would have had limited the Claimant's damage. After the Claimant had refused said offers it had arranged for the shipment of the 9,000 mts to Namibia.

The Respondent continues to submit that the Claimant failed to substantiate its alleged damage. For this reason, the Respondent denies that a damage of USD 1,100,000 occurred. Furthermore, it denies that, in the matter on hand, production downtimes arose due to the lack of deliveries of sulphuric acid. It also denies that the business relationship between the Claimant and IPSL have been strained after the delivery of the first 9,000 mts. And finally, it denies that IPSL was entitled to assert claims for damages. In particular, it denies the amount of the alleged damage.

If the Claimant - so the Respondent - would be entitled to claim damage compensation at all it would be obliged to make a calculation according to the contract, Annex C1, and assume a minimum delivery quantity of 9,000 mts less 5%.

In addition, the Respondent regards the claims for interests asserted by the Claimant as unjustified, at least as far as the amount of 8% percentage points over the basis interest rate is concerned because Section 288 paragraph 2 of the German Civil Code only applies to claims for consideration rather than claims for damages. Moreover, the Respondent believes that interests must not be claimed as from an early date like November 1, 2007 because the delivery of the (denied) second lot of 9,000 mts had been planned to be made as late as in December 2007.

The Respondent, on its part, claims payment of laytime charges of USD 55,889.60 = EUR 43,610.40 from the Claimant, incurred in connection with the first delivery of 9,000 mts in the port of discharge Puerto Cabello. Said claim is asserted by it by means of a counterclaim and as an alternative or precaution respectively by way of a set-off for the event that the cause of action will be admitted.

According to the Respondent's submission, the contract, Annex C1, provides for marine terms pursuant to which the discharge rate amounts to "80 mts per hour SHINC" (inclusive of Sundays and holidays). The Respondent states that, as a matter of fact, 44.95 mts per hour had been unloaded only. For said reason, the handling of the vessel had been delayed by 3 days, 11 hours and 50 minutes (3.4931 days), and this is what the Respondent invokes to justify its claim. According to the charter party agreed upon with the ship's owner, it was to pay to said owner an amount of USD 18,500 per day. When issuing the invoice for the Claimant on November 29, 2007, it had, however, complied with their contractual agreement - according to the notice given on September 12, 2007, Annex SB6 - and charged laytime fees of USD 16,000 per day (Annex SB7, Laytime Calculation; Annex SB4) and thus USD 55,889.60.

In any other respects, the Arbitration Tribunal makes reference to the contents of the Respondent's statements of case.


Progress of the Proceedings

The Respondent was served with the statement of claim on September 10, 2008 and the Claimant was served with the alternative counterclaim on October 24, 2008. Prior to said date, the Respondent had not given notice about a set-off against its counterclaim. On January 15, 2009, oral proceedings were held. The Parties agreed to have failed to reach an amicable solution by that date and that the Arbitration Tribunal was to solve the dispute. This situation has remained unchanged since then.

Case 1:10-cv-03240-TPG   Document 1   Filed 04/16/2010   Page 24 of 67

ARBITRATION TRIBUNAL OF THE CHAMBER OF COMMERCE OF HAMBURG                Page 9 of 15
Ameropa AG ./. Havi Ocean Co. (L.L.C.)

Following oral proceedings, a settlement out of court failed to be agreed upon. The Arbitration Tribunal did not give its approval to an extension of the statutory term for settlement as provided for in the minutes of the hearing because, contrary to the provisions set forth there, only one Party had filed an application for extension. Then, the Parties filed their written comments to the outcome of the oral proceedings in due time. After that, the Arbitration Tribunal ordered the closing of the proceedings by fax message dated February 20, 2009. On February 24, 2009, a statement of case written by the Respondent was received by the Arbitration Tribunal but rejected due to receipt behind schedule. Thereupon, the Respondent replied on February 26, 2009 and asked for an explanation of the term "closing of the proceedings": The language agreed upon for arbitration proceedings had been deemed to be the German language.

## Ratio Decidendi

### Competence of the Arbitration Tribunal

This Arbitration Tribunal is competent to make a decision in the dispute on hand. Said competence can be derived from the dispute clause provided for in the contract, Annex C1, agreed upon between the Parties. An amicable solution failed to be reached between them. As confirmed by the minutes of January 15, 2009, the Parties are in agreement in this respect.

### As to the Submissions of the Parties

The Parties, especially the Respondent, had been given sufficient opportunities to file submissions with respect to the facts of the case.

Prior to the oral proceedings, each Party had filed several statements of case; during the hearing, the dispute was comprehensively discussed; for a certain term after the hearing, the Parties had the possibility to negotiate a settlement out of court and the Arbitration Tribunal would have had extended said term if requested by both Parties (which was, however, not the case). After the expiry of said term, another term started within which both Parties filed their comments with respect to the outcome of the oral proceedings. After that, the Arbitration Tribunal ordered the closing of proceedings on February 20, 2009. A statement of case of February 24, 2009 received by the Arbitration Tribunal from the Respondent was rejected for being behind schedule. Thereupon, the Respondent had the Arbitration Tribunal asked on February 26, 2009 to explain the term "closing of the proceedings".

Said term is used to be applied in arbitration proceedings. The generally known DIS (German Institution for Arbitration, reg. association) Rules of Procedure include said term in section 31 of its German and English versions as it is the case with the ICC Rules in Section 22. The German term is: "Beendigung des Erkenntnisverfahrens".

Apart from what has been elaborated on above, the Parties made use of the German as well as of the English languages during proceedings in mutual consent. They disagreed with respect to contracts and correspondence written in English; as to the facts of the case, they submitted Annexes in the English language without any exception (20 filed by the Claimant and 13 filed by the Respondent). This corresponds to Section 15 of the Rules of the Chamber of Commerce of Hamburg according to which the decision about the language of proceedings is up to the Parties. It must be admitted, however, that submissions filed by the Claimant are contradictory: in its statement of claim (section 42), it concludes that German is the court language; nevertheless, it filed all Annexes in the English language without translations. In case of a dispute between parties coming from Switzerland, Arab and South American countries, however, it might be a matter of course to express oneself in the English language. All that said, the Arbitration Tribunal must proceed from the assumption that the Respondent and its attorneys of record should, in any case, have been familiar with the meaning of the term "closing of the proceedings". And this also because the Parties had already been informed about the fact that the Arbitration Tribunal planned

Case 1:10-cv-03240-TPG     Document 1     Filed 04/16/2010     Page 25 of 67

ARBITRATION TRIBUNAL OF THE CHAMBER OF COMMERCE OF HAMBURG                    Page 10 of 15
Ameropa AG ./. Havi Ocean Co. (L.L.C.)

to issue a written award after the expiry of the term for submitting statements of the case (minutes of January 15, 2009).

<u>As to the Statement of Claim and the Counterclaim</u>

The claim asserted by the Claimant in the total amount of EUR 720,216.03 is justified. The remaining amount forming a subject matter of the statement of claim cannot be demanded by the Claimant.

This amount consists of the following elements (initially without interests):

| | | |
|---|---|---|
| Damages for failure to deliver the second lot of 9,000 mts: | EUR | 715,294.00 |
| Damages for lost profits: | EUR | 43,610.40 |
| equal to | EUR | 758.904.40 |
| Counterclaim of the Respondent for payment of laytime fees: less | EUR | 38,688.37 |
| as a result, a total of | EUR | 720,216.03. |

### (1) <u>Damages for Failure to Deliver the Lot of 9,000 mts</u>

This claim for compensation amounts to USD 1,100,000, undisputedly converted (<u>Annex C17</u>, page 1) to EUR 715,294.00. Applying German law uncontroversially (cf. also Section 16 paragraph 2 of the Rules of the Arbitration Tribunal of the Chamber of Commerce of Hamburg) pursuant to Section 280 paragraphs 1 and 3, Section 281 paragraph 1 sentence 1 and paragraph 2 of the German Civil Code, said claim is justified. As a matter of fact, the Respondent failed to deliver the second lot of sulphuric acid owed by it due to the contract submitted as <u>Annex C1</u>. In said context, the Claimant was not obliged to set a deadline for this delivery because the Respondent had "earnestly and definitely" refused to deliver during the discussions held in Zurich and, again, by letter of its attorney at law of Dubai (<u>Annex C10</u>), at the latest. Its "not being liable" (Section 280 paragraph 1 sentence 1 of the German Civil Code), for instance due to events of force majeure or the like, has not been claimed by the Respondent. Just to the contrary: according to its own statements, another 9,000 mts were at its disposal and offered by it to the Claimant, but at a higher price than the one agreed upon (the cost price of USD 140/mt plus shipment and other costs, so that the total price amounted to USD 258). The Claimant was, in turn, not obliged to accept such a price because it was entitled to rely on the contract. The fact that market prices had meanwhile increased (as submitted by the Respondent) was one of the risks to be borne by the Respondent. In detail:

### (a) The alleged modifications of the contract

The Respondent failed to deliver the second lot of sulphuric acid although it was obliged to do so according to the contract submitted as <u>Annex C1</u>. Contrary to the statements made by the Respondent, said contract had not been changed or modified. To begin with, the Respondent is not right when relying on the correspondence between itself and the Claimant's employee in Cairo, Mrs. Abeer Shams, as submitted by <u>Annexes C3 and C4/SB1</u>. From <u>Annex C3</u>, it derives a contract offer. But this is not what this email includes because it merely contains information about the "attempt" of the Respondent to obtain a freight. Said attempt (on top of everything) refers to a freight quantity of 15,000 mts only. There is no comment at all with respect to the fact that, all of a sudden, the Claimant would receive not more than 15,000 mts rather than two lots of 9,000 mts each. And what is more, the date of loading for this "attempt" did not correspond to the original "October" date. No doubt that the consequences of a deficiency of 3,000 mts of sulphuric acid and the further postponement of the delivery date should have become a subject matter of negotiations. Contracts as well as declarations of intentions have to be interpreted in a way as required by "good faith by taking general customs into account" (Section 157, German Civil Code). An international dealer like the Claimant would not have construed the email, <u>Annex C3</u>, as a contract offer. And irrespective of this, the reply given by Mrs. Shams (<u>Annexes C4 = SB1</u>) did not represent the

ARBITRATION TRIBUNAL OF THE CHAMBER OF COMMERCE OF HAMBURG
Ameropa AG J. Havi Ocean Co. (L.L.C.)

Page 11 of 15

acceptance of an offer. It must be admitted that her answer comes as a surprise when she says: "We will nominate a 15000 mt vessel today, shipment end September". According to the contract, the task to nominate a ship was up to the Respondent, and "end September" did not comply with the contract. And finally, Mrs. Shams said: "I have advised Hamburg office", and this shows that she informed said office and, in addition, was obliged to inform it. And the last sentence in the email sent by Mrs. Shams (Annex C4/SB1): As agreed I am waiting for your nomination today asap" does not change anything here. It was clearly evident that her email was given with the reservation that "Hamburg" was to be informed first. In other words, she had no power or authority to transact. And last but not least, the Respondent failed to substantiate why Mrs. Shams was supposed to act within the framework of an agency by estoppel. By this, however, the discussions held on that day were not finished. On the same day, Mrs. Shams forwarded the notice given by IPSL, Annex C5, and meanwhile received by her from which it can be derived that said customer did not agree to the Respondent's proposal: "But we definitely need to load maximum 9,000 mts." As a consequence, the nomination of MT "Alessandro DP" made by the Respondent (Annex SB2) grasps at nothing. And therefore, the first contract modification alleged to have taken place by the Respondent has not been conclusively explained.

The Respondent alleges that a second contract modification took place upon request of the Claimant. This modification, too, fails to be explained conclusively. The Respondent argues that the Claimant had waived the delivery of 15,000 mts and then only insisted on a quantity of a total of 9,000 mts. The Respondent submits that this could be learned from the Claimant's email, Annex C5 (by mistake, it talks of C6). This submission is not justified, and this for the mere reason that a contract modification from two times 9,000 mts to 15,000 mts had not taken place. And Annex C5 itself, as relied on by the Respondent, does not result in a contract modification. This email definitely proves that IPSL insisted on a delivery of two times 9,000 mts: "Seeing Havi can swap our and EFIC's cargoes then the possibility to load only 9kt by end Sept for us and the balance 6kt to ship it beg Oct together with our original 9kt", what was said to be "workable" for EFIC, too. It is true that it can also be derived from the email that the Venezuelan seller had no objections against the use of the tanker "Alessandro DP" always provided, however, that its cargo of 15,000 mts would be shared between itself and the EFIC company as already mentioned. And finally, it is also explained there that IPSL would only be able to unload and store a quantity of 9,000 mts at the port of discharge. All that said, it is evident that the Claimant did not desire and request a contract modification.

(b) The alleged damage of US 1,100,000

Due to the failure to deliver 9,000 mts, the Claimant, at first, suffered from a damage of EUR 715,294 because it was to pay compensation for damages incurred by its customer under the contract submitted as Annex C2. True, it did not make a covering purchase but can actually calculate its damage also in another way. The Claimant paid damages to its customer IPSL due to the failure to fulfill the contract submitted as Annex C2 in the amount of USD 1,100,000 equal to EUR 715,294. On the merits, this is proven by the letter of IPSL that was signed both by IPSL and the Claimant (Annex C14). This is furthermore proven by the invoice issued by IPSL (Annex C15), the acknowledgement of receipt of the amount, as issued by IPSL (Annex C16) and the confirmation of the exchange rate (Annexes C17 and C18). There is no reason for the Arbitration Tribunal to have any doubts with respect to the correctness and validity of said payment. True, the Respondent denied the amount of the damage but said denial has, as a whole, not been substantiated. The denial with respect to the damage of USD 1,100,000 has been submitted quite generally; the contract submitted as Annex C2 shows that the Claimant was in default towards its customer; the letter, Annex C14, signed by both parties of said contract has not specifically been questioned by the Respondent; neither did it deal specifically with the invoice (Annex C15), the acknowledgement of receipt (Annex C16) and the confirmation of the exchange rate (Annexes C17). For this reason, the Arbitration Tribunal must assume a damage of EUR 715, 294.

The points elaborated on in the following show, in addition, that the Claimant was right when paying the amount of USD 1,100,000 to IPSL. Taking said points into account, the damage incurred by IPSL amounts to more - and not less - than the compensation paid in the amount of USD 1,100,000.

To make it definitely clear again, IPSL claims from the Claimant a compensation for damages due to partial non-fulfillment of its contract, <u>Annex C2</u>, in the amount of the difference between its covering transaction with a third party ("tercero") and the basis transaction that had not been fulfilled by the Claimant. The Arbitration Tribunal also had to deal with the damage incurred by IPSL because it formed the basis for the damage incurred by the Claimant.

Said difference can be determined by the following calculation:

USD 280/mt x 9,000 mts equal to    USD 2,520,000
USD 149/mt x 9,000 mts equal to    <u>USD 1,341,000</u>
thus                               USD 1,179,000

For the purpose of this calculation, the Arbitration Court assumes a price per ton of USD 280, as hereinafter explained in more detail.

According to <u>Annex C20</u> (last page, small box), such difference is said to be derived on the basis of a quantity, expressed in tons, of 9,000 mts plus an allowance of 10%, at a price of

"AMEROPA 9,000 mts +/./. 10% ..... USD 149/mt    =    USD 1,475,100
Tercero    9,000 mts +/./. 10% ..... USD 320/mt    =    <u>USD 3,168,000</u>",
Thus, the difference amounts to                         USD 1,692,900.

These final figures are, however, incorrect because they are based upon 9,000 mts plus 10%. Actually, the Respondent cannot assume an increase of the delivery quantity because this option could be exercised by the Claimant and IPSL only which, however, was not the case: "Shipping tolerance in buyer's option" (<u>Annex C1</u> page 1 as well as <u>Annex C2</u> page 1).

IPSL alleges to have paid USD 320/mt to "tercero". The Claimant reimbursed USD 1,100,000, that means: per ton an amount of USD 1,100,000 divided by 9,000 mts = USD 122.22. So, if IPSL actually paid USD 320 per ton and an amount of USD 122.22 per ton was reimbursed by the Claimant the resulting difference would amount to USD 320 less USD 122.22 = USD 197.78. Correspondingly, IPSL still would have had incurred a damage of USD 197.78 per ton in spite of the USD 122.22 reimbursed by the Claimant. The Arbitration Tribunal believes that it is unlikely that IPSL would have had accepted this.

For this reason, the Arbitration Tribunal investigated which price per ton could have had been paid by IPSL to its supplier "tercero" and made the following approximate calculations:

|  | 320 | 300 | 280 | 260 | 270 |
|---|---|---|---|---|---|
| ./. | <u>122.22</u> | <u>122.22</u> | <u>122.22</u> | <u>122.22</u> | <u>122.22</u> |
|  | 197.78 | 177.78 | 157.78 | 137.78 | 147.78 |

Said calculations show that the price paid by IPSL to its supplier must, in any case, have been close to USD 270/mt and, to be precise, slightly higher.

The Arbitration Tribunal continues to calculate: USD 149 plus USD 122.22 are equal to the minimum cost price IPSL might have paid in order to be free from damage, that means USD 271.22 per ton. The genuine price was higher, as it has been demonstrated by the

Case 1:10-cv-03240-TPG    Document 1    Filed 04/16/2010    Page 28 of 67

ARBITRATION TRIBUNAL OF THE CHAMBER OF COMMERCE OF HAMBURG                    Page 13 of 15
Ameropa AG ./. Havi Ocean Co. (L.L.C.)

undisputed submissions of both Parties with respect to the market situation. As already mentioned, the Respondent itself had offered a market price of USD 250/mt.

According to the estimations made by the Arbitration Tribunal, the damage incurred by IPSL amounts to USD 280/mt, analogous to Section 287 paragraph 1 sentence 1 Code of Civil Procedure. After all, it is admissible to assume that "tercero" has taken advantage of the difficult market situation.

Even the Respondent achieves a nearly approximating result. The market price of "somewhat more than USD 258/mt", as mentioned by it, would already result in a damage of

| | |
|---|---|
| USD 258/mt x 9,000 mts equal to | USD 2,322,000 |
| less 9,000 mts x USD 149/mt equal to | USD 1,341,000 |
| thus | USD   981,000, |

and, therefore, in an amount coming very close to the one paid to IPSL by the Claimant.

(c) Mitigation of losses

Contrary to the Respondent's statements, the Claimant did try to minimize its losses. The Arbitration Tribunal proceeds from the assumption that, at the end of October, the "market (…)" was "very short", as reported to Ameropa Düngemittel GmbH by the Polish company Interchem Trading p.l. on October 29, 2007 (Annex C20 page 1). Another supporting evidence is given by the Respondent's offer to deliver at a price of USD 250/mt. From the correspondence, it can be learned that sulphuric acid of the quality desired by IPSL was not available at that time (Annex C20 page 2). Other emails support that unsuccessful discussions about deliveries had taken place (Annexes C20 pages 4 and 5). Even from Korea, no commodities could be delivered (Annex C20 page 6). The Arbitration Tribunal cannot identify any significant statements in the market reports, Annex SB12, submitted together with the Respondent's statement of case dated February 19, 2009 because they refer to circumstances in 2009. Apart from that, said reports do not include anything about deliveries from India or the Iran, something that was, however, required by the contracts submitted as Annexes C1 and C2. Annex SB 13 could not be taken into consideration because it was submitted behind schedule.

Furthermore, the Claimant had held successful negotiations with IPSL with respect to the latter's claim for damages. This is what the Arbitration Tribunal must assume due to the submitted Annexes which have not even been successfully challenged by the Respondent. Initially, IPSL had claimed damages from the Claimant in the amount of USD 1,692,900, something that can be learned from the invoice, Annex C13, and from an email from Jeffry Carreno dated January 28, 2008 (Annex C20 page 8). In said email, he talks about a replacement delivery by a third party to IPSL (this can be derived from Annex C13) at a price of USD 320/mt. The price difference to USD 147/mt according to the contract submitted as Annex C2 amounts to USD 171/mt, and thus to USD 1,692,900 for 9,000 mts. The Claimant had resisted said initial invoice of IPSL of January 28, 2008 showing an amount of USD 1,692,900 (Annex C13) and had held negotiations in this respect, as it can be learned from the commonly signed letter, Annex C14, of May 15, 2008.

The Claimant was not obliged to accept the offers of compromise made by the Respondent. A non-recurring payment of EUR 500,000 is lower than the damage actually suffered by it. The same applies to the offer dated October 17, 2007: a delivery of 8,100 mts at a price of USD 250/mt (Annex SB8) was not acceptable. First of all, the factor 8,100 is not correct, as already explained. What is more: Had the Claimant accepted such an offer it would have had to pay USD 2,250,000 to the Respondent in advance - on the basis of 9,000 mts. True, afterwards it would have had received USD 149 per ton from IPSL. In view of the agreement

made according to Annex C, the Claimant was not obliged to accept this and could not be expected to do so.

### (d) Claim for interests

The Claimant also demands interests, and this at a flat rate of 8% per year as from June 16, 2008. A reminder was not necessary in this connection because the delivery time had been fixed in terms of a calendar period: November 2007 (Section 286 paragraph 2 point 1). Claims for damages, however, do not correspond to "claims for consideration" which, according to Section 288 of the German Civil Code, qualify for eight percentage points. Therefore, the default interest rate above the basic interest rate amounts to five percentage points only. But the Claimant assumes a lump sum calculation and thus disregards the basis interest rate. Consequently, the claim for interests is only justified when amounting to the variable basic interest rate according to Section 247 plus 5%. The upper limit for the claimed interests according to the Claimant's application is, however, 8%. The interest period starts on June 17, 2008, one day after the Claimant had indemnified IPSL. A reminder was not necessary because the time for delivery had been fixed in terms of a calendar period: November 2007 (Section 286 paragraph 2 point 1). On said day, the basic interest rate amounted to 3.32%, as from July 1, 2008 to 3.19% and as from January 1, 2009, it amounts to 1.82%.

### (2) Lost Profits of the Claimant

The Claimant is entitled to demand compensation for lost profits from the Respondent in the amount of EUR 43,610.40 plus interests.

This can be derived from Sections 247, 252, 276, 280, 288 German Civil Code. It is undisputed that lost profits consist of the difference between the purchase prices according to both contracts, Annexes C1 and C2. Said difference amounts to USD 149/mt less USD 142/mt equal to USD 7/mt x 9,000 mts equal to USD 63,000 and, as undisputedly converted, equal to EUR 43,610.40. In this respect, neither the purchaser nor the Claimant have made use of the option of an increase or a reduction of the purchase volume. The default interest rate is equal to the basic interest rate plus five percentage points because here, too, the claim is not a "claim for consideration".

The interest period starts on December 1, 2007. In this connection, the Parties disagree. According to the Claimant, it starts on November 1, 2007: "2nd lot with loading l/c November 2007". The Respondent is right when challenging this. The question is at what time the Claimant would have had received the purchase price for the second lot. IPSL would have had been obliged to pay according to the contract submitted as Annex C2 only if the Respondent had delivered. And according to the contract submitted as Annex C1, it would have had time until November 30, 2007. A reminder was not necessary because, in the opinion of the Arbitration Tribunal, "the immediate occurrence of the default was justified for special reasons when the interests of both Parties into account" (Section 286 paragraph 2 point 4). Since it was already at this time that the Respondent had - in Zurich - refused to deliver the second lot.

### (3) Counterclaim of the Respondent

The Respondent claims laytime charges amounting to USD 55,889.60. It had applied for said sum during the oral proceedings (also page 12 of the statement of defense, different than there on page 11). When taking the undisputed exchange rate as a basis, this is equal to USD 55,889.60 x EUR 0.6922285, and thus to EUR 38,688.37. In its statement of case dated October 24, 2008 on page 12, the Respondent applied for a set-off against the counterclaim in the event that the complaint is justified. The Claimant did not deny said claim. Neither did it file any application with respect to the counterclaim. Thus, there was no reason for the Arbitration Tribunal to examine this demand any further. The set-off has become effective on the date of the service of the counterclaim, namely

October 24, 2008 (according to the minutes of the oral proceedings) (Section 388 German Civil Code). The claim for interests in this connection has thus become irrelevant.

### (4) Settlement of Interests and Costs

With respect to the interests of the admitted demands of the Claimant, the Arbitration Tribunal has deducted the justified counterclaim of the Respondent from the principal claim of the Claimant because the entitlement to receive a payment of lost profits arose later than the principal claim.

In mutual consent with the Parties, the Arbitration Tribunal fixes the value in dispute at EUR 758,904.40. In this connection, the Tribunal has not taken Section 45 of the Court Fees Act with respect to the amount of the counterclaim into account.

The costs of the arbitration proceedings and the extrajudicial costs must be borne by the Parties in proportion to the ratio of prevailing / defeated, namely EUR 758,904 : EUR 720,216.03. This means that the Respondent has to bear 95% of said costs and the Claimant 5%. The distribution of costs in terms of the precise amounts shall be made by the Arbitration Tribunal of the Chamber of Commerce of Hamburg.

Hamburg (place of the Arbitration Tribunal), on this 25th of March, 2009

[signature]                    [signature]                    [signature]
(Ulf Becker)                   (Axel Bartels)                 (Dr. Johannes Trappe)

---

*This is to certify the completeness and fidelity of the preceding translation of the attached German document.*
*Place: Telgte*
*Date: March 24, 2010*

# S c h i e d s s p r u c h

des

## Schiedsgerichts der Handelskammer Hamburg

in dem Rechtsstreit

## Ameropa AG vs. Havi Ocean Co. (L.L.C.)

Hamburg, den 25. März 2009

SCHIEDSGERICHT DER HANDELSKAMMER HAMBURG                          Seite 2 von 15
Ameropa AG vs. Havi Ocean Co. (L.L.C.)

In dem Rechtsstreit

**der Ameropa AG,**
vertreten durch den Verwaltungsrat Felix Zivy, Andreas Zivy, Marcus Damman, Charles
Waffenschmidt, Jan Kadanik und Nicole Miescher-Zivy,
Rebgasse 108
CH-4102 Binningen, Schweiz,

Verfahrensbevollmächtigte:
Lehmann Rechtsanwälte,
Hamburg,

gegen

**Havi Ocean Co. (L.L.C.),**
vertreten durch den Managing Director Saeed Daneshmand,
Office 204, Al Rais Building
SK. K. Bin Zayed Road, Opp. Burjuman,
P.O.Box 29061,
Dubai, Vereinigte Arabische Emirate,

Verfahrensbevollmächtigte:
Dabelstein & Passehl Rechtsanwälte,
Hamburg,

hat das Hamburger Schiedsgericht der Handelskammer Hamburg durch die Schiedsrichter
Ulf Becker, Axel Bartels und Dr. Johannes Trappe ( Obmann ) auf Grund der mündlichen
Verhandlung vom 15. Januar 2009 und der gewechselten Schriftsätze der Parteien am 25.
März 2009 entschieden:

> **Die Beklagte wird verurteilt, der Klägerin € 720.216,03 ( Euro siebenhundert-**
> **zwanzigtausend zweihundertsechzehn und drei Cent ) zu zahlen.**
>
> **Außerdem wird sie verurteilt, der Klägerin die folgenden Zinsen pro anno zu**
> **zahlen: Auf € 676.605,63 den jeweils geltenden Basiszinssatz plus 5% ab**
> **17.6.2008 und auf € 43.610,40 den jeweils geltenden Basiszinssatz plus 5% ab**
> **1.12.2007, in beiden Fällen jedoch höchstens 8%.**
>
> **Schließlich wird die Beklagte verurteilt, 95% der schiedsgerichtlichen und**
> **außergerichtlichen Kosten der Klägerin zu tragen, während die Klägerin 5%**
> **dieser Kosten tragen muss.**
>
> **Die weiter gehende Klage wird abgewiesen, ebenso wie die Zinsforderung der**
> **Beklagten.**
>
> **Der Streitwert beträgt € 758.904,40.**

Die Begründung ergibt sich aus dem folgenden Tatbestand und den anschließenden Ent-
scheidungsgründen.

## Tatbestand

### Einleitung

Die venezolanische  International Petrochemical Sales Ltd. ( IPSL ) wollte zwei Partien von
je 9.000 mt Schwefelsäure ( sulphuric acid ) kaufen und fragte dieserhalb bei der Klägerin –
der Ameropa AG, Binningen, Schweiz,  - an, ob sie ihr diese liefern könnte. Die Klägerin,
vertreten durch ihr Tochterunternehmen Ameropa Düngemittel GmbH, Hamburg,  war dazu
bereit, falls sie sich dementsprechend eindecken könnte. Als Lieferant bot sich die Beklagte
– Havi Ocean Co. (L.L.C.), Dubai – an. Verträge wurden geschlossen. Die Beklagte lieferte
der Klägerin  eine Partie von 9.000 mt, nicht aber eine umstrittene zweite Partie derselben
Menge. Die Klägerin verklagte sie daraufhin vor dem Schiedsgericht der Handelskammer
Hamburg auf Schadensersatz mit der Begründung, die Beklagte hätte auch die zweite Partie
von 9.000 mt liefern müssen, der die Beklagte widerspricht. Widerklagend begehrt die Be-
klagte Zahlung von Liegegeld, entstanden bei der Verschiffung der ersten Partie.

### Der unstreitige Sachverhalt

IPSL und die Klägerin verhandelten im Sommer 2007 über die Lieferung von zweimal 9.000
mt. Am 1. August 2007 unterbreitete IPSL der Klägerin ein festes Angebot, welches ihr die
Klägerin bestätigen sollte. Jedenfalls unterzeichneten Klägerin und Beklagte ihren Purchase
Contract No. PU-005896 unter dem 2. August 2007( Anlage C1 ). Am selben Tage fertigte
die Klägerin ihren Vertrag mit IPSL aus ( Anlage C2 ), welchen IPSL am 14. August unter-
schrieben an die Klägerin zurücksandte.

Die beiden Verträge sind im wesentlichen bis u.a. auf den Kaufpreis „back-to-back". Danach
beträgt die Liefermenge jeweils „18.000 mts +/-5% shipping tolerance in buyer's option ( in 2
lots of 9.000 mts +/-5% each )", unter dem IPSL-Vertrag diese Mengen jeweils „+/- 10%". Der
Lieferpreis beträgt zwischen den Parteien dieses Verfahrens „USD 142,00 pmt CFR Puerto
Cabello Venezuela", unter dem IPSL-Vertrag „USD 149,00 pmt CFR PO Puerto Cabello". Im
ersten Vertrag ( Anlage C1 ) heißt es: „Origin: Iran", im 2. Vertrag ( Anlage C2 ): „Origin: Iran
and/or India". Die Lieferzeit lautete im Vertrag zwischen Klägerin und Beklagte zunächst auf
„1st half of September" und „2nd half of September", wurde dann aber im Vertrag Anlage C1
auf „1st lot with loading I/c October 2007, 2nd lot with loading I/c November 2007" unstreitig
umgeschrieben. Der IPSL-Vertrag ( Anlage C2 ) nennt den ursprünglichen shipment-Zeit-
punkt. Der Vertrag der Parteien ( übrigens ebenso wie der IPSL-Vertrag ) enthält darüber
hinaus folgende Schiedsklausel:

> „Disputes:
> Any dispute in the interpretation and/or execution of this contract to be settled in an amicable
> way. If an amicable solution of the problem is impossible, both parties agree on arbitration ac-
> cording to the rules of the Chamber of Commerce in Hamburg, Germany and their findings will
> be final and binding for both parties".

Schließlich enthält der Vertrag Anlage C1 ( ähnlich wie der Vertrag Anlage C2 ) folgende

> „Marine Terms:
> a) All marine terms as per governing charter party including DEM/DES.
> b) DEM/DES calculation to be presented and settled within 60 days after completion
>    of discharging/loading.
> c) Discharge rate: 80 mts per hour SHINC."

Am 3. September 2007 erhielt die Angestellte der Klägerin, Frau Abeer Shams in Kairo, von
der Beklagten folgendes Schreiben ( Anlage C3 ):

„We are trying for a quantity of 15,000 MTs, to complete the total contract in one shipment, from Hindalco with the same specifications as provided earlier, from Sterlite. Shipment would be effected around 21st Sept '07 to reach the discharge port in Venezuela by end Oct. The vessel will be nominated in a couple of days."

Darauf antwortete Frau Shams der Beklagten am selben Tage ( Anlagen C4 = SB1 ):

„I have advised Hamburg office ( die Tochtergesellschaft der Klägerin ) that we will nominate a 15000 mt vessel today, shipt end Sept and same info was conveyed to Venezuelans who were very happy to hear such news. As agreed I am waiting for your nomination today asap."

Ebenfalls am 3. September 2007 schrieb die Beklagte an Frau Shams ( Anlage SB2 ):

„... Vessel Nomination-Venezuela Shipment:
Importance High
Dear Madam,
For MT ALESSANDRO DP,
LOA: 138,11m
Beam : 23m
Draft: 9.40m
Thanks and Best Regards ...".

Noch am selben Tage schrieb IPLS an Frau Shams ( Anlagen C5 = SB11 ):

„As per our telcon moments ago, pls note that vessel itself would be accepted by receivers ( except disrate must be 80 mts per hour ) but we definitely need to load maximum 9.000 mts. Seeing Havi can swap our and EFIC's cargoes then the possibility to load only 9kt by end Sept for us and the balance 6kt to ship it beg Oct together with our original 9kt ( i.e. total 15kt ) for EFIC should be workable as well especially in view of present production problems then loading less qtty in the beginning shud be better fr suppliers. Storage capacity in destination is unfo limited to 9kt ( despite receivers continued efforts to receive up to 13kt ). On the other hand, if there are any other background reasons that Havi is reticent to ship us 9kt in end Sept ( i.e. to mitigate some losses ) then we would like to know abt to analyze further.
Abeer: the results of being blacklisted by the Venezuelans can have devastating effects fr our overall strategy in latin America.
We absolutely need Havi's agreement/support to load only m9kt fr end sept shipment. Pls kindly discuss over with mr daneshmant and revert back urgently with his reply, and as discussed we will highly appreciate if he can accept our invitation to him to come to Hamburg on wednesday to discuss further."

Frau Shams gab diese Nachricht an die Beklagte weiter ( Anlage SB11 ).

Drei Tage später, am 6. September 2007, nominierte die Beklagte der Klägerin das MS „Havi Ocean" für 9.000 mt. IPSL akzeptierte diese Nominierung sofort. Am 12.9.2007 wurde diese Nominierung durch das Schiff „Stolt Ami" ersetzt, was wiederum IPSL sogleich bestätigte. Dieses Schiff lud in Indien am 27. September 9.000 mt, erreichte Puerto Cabello am 31. Oktober und war am 8. November entladen.

Es entstand Streit, ob die Beklagte die zweiten 9.000 mt Schwefelsäure liefern müsse. Am 11. Oktober besprachen die Parteien in Zürich die Lage, mit dem Ziel, eine freundschaftliche Lösung zu finden. Im Laufe dieses Gesprächs bestritt die Beklagte, verpflichtet zu sein, die zweite Partie Schwefelsäure zu liefern. Das Treffen blieb ohne Ergebnis.

Am 17. Oktober bot die Beklagte der Klägerin an, ihr in der ersten Hälfte November 9.000 mt zu liefern zum Preise von USD 250 pro Tonne ( statt USD 142/ mt ) ( Anlage SB8 ), was die Klägerin ablehnte.

In der Zwischenzeit hatte die Klägerin erfahren, dass die Beklagte den Tanker „Sanmar Majesty" geschlossen hatte für 10.000 mt +/-5% Schwefelsäure, Ladehafen Indien/

Löschhafen Option Walvis Bay ( Namibia ) oder Puerto Cabello ( Venezuela ), Ladezeit „first half-mid November 2007". Auf Nachfrage bestätigte dann Lloyd's Intelligence Bureau, dass dieser Tanker tatsächlich am 17. November in Indien 9.535,306 mt geladen und am 9. Dezember in Walvis Bay gelöscht hätte ( Anlage C6 ).

Es folgte ein Schriftwechsel zwischen dem Prozessbevollmächtigten der Klägerin und der Beklagten sowie später mit ihrem Rechtsanwalt in Dubai ( Anlagen C7 – C12 ), in dem beide Seiten auf ihrem Standpunkt verharrten.


Der Vortrag der Klägerin

Die Klägerin hält die Beklagte für vertragsbrüchig, weil sie sich zu Unrecht geweigert habe, die zweite Partie Salzsäure von 9.000 mt zu liefern. Grund für diese Weigerung sei die erhebliche Preissteigerung auf dem Chemikalienmarkt gewesen. Eine von der Beklagten behaupteten Einigung auf eine Liefermenge von insgesamt lediglich 15.000 mt oder gar von lediglich 9.000 mt sei nicht erfolgt.

Wie sie im einzelnen vorträgt, hatte sie im Juni und Juli 2007 mit der IPSL einen Vertrag ausgehandelt, den IPSL am 1. August bestätigt hatte unter der Voraussetzung, dass ihn auch die Klägerin bekräftigte. Diese Bestätigung habe sie zunächst am 2. August der Beklagten zur Kenntnis übersandt, die diese am selben Tage gebilligt habe. Am selben Tage habe sie dann den Kaufvertrag Anlage C1 der Beklagten übersandt, die ihn unterschrieben am 20. August zurück geschickt habe. Am 3. August habe sie sodann den Vertrag Anlage C2 formuliert und ihn der IPSL zugesandt, welche ihn unterschrieben am 14. August zurückgesandt habe.

Die Beklagte, so fährt die Klägerin fort, habe Lieferschwierigkeiten bekommen, habe jedoch keinerlei Belege vorgelegt, wie sie der Kaufvertrag Anlage C1 unter der Rubrik „Force Majeure" vorsehe. ( Dies ist unstreitig. ) Am 3. September habe diese das Schreiben Anlage C3 an die im Kairo arbeitende Angestellte der Klägerin, Frau Abeer Shams, gesandt, worin es heißt, dass eine Liefermenge von 15.000 mt sollte „complete the total contract in one shipment". Mit dem Schreiben Anlage C4 habe Frau Shams den Vorschlag an sich begrüßt, habe ihn aber zunächst nach Hamburg weitergeleitet, da ein solcher grundlegender Änderungsvorschlag zunächst vom Endkäufer IPSL hätte gebilligt werden müssen. IPSL indessen habe dem Vorschlag nicht zugestimmt, sondern vielmehr darauf bestanden, dass zwei Teilmengen von je 9.000 mt geliefert werden müssten, weil nämlich angesichts des beschränkten Lagerkapazitäten in Puerto Cabello jeweils nur 9.000 mt gleichzeitig gelöscht werden könnten, insgesamt also 18.000 mt geliefert werden müssten. Dies habe Frau Shams der Beklagten mitgeteilt ( Anlage C5 ).

Am 6. September 2007 habe die Beklagte den Tanker „Havi Ocean" für 9.000 mt nominiert ( Anlage C2 ), und damit offenbar ihren früheren Vorschlag über die Verschiffung von 15.000 mt mit dem Tanker „Alessandro DP" fallen gelassen. Der Tanker „Havi Ocean" sei kein Ersatz für den „Alessandro MP" gewesen. MT „Havi Ocean" sei dann am 12. September durch den Tanker „Stolt Ami" für 9.000 mt ersetzt worden. Dieses Schiff habe am 27. September geladen. Frau Shams, welche die Beklagte missverstehe, habe keine Vollmacht zur Vertragsänderung besessen.

Am 1. Oktober habe die Beklagte mitgeteilt, es ergebe sich die Möglichkeit, 7.000 mt bis 8.000 mt zu Ende Oktober/Anfang November zu verladen. Eine solche Menge würde aber Probleme mit IPSL verursacht haben.

Bei dem Zürcher Treffen am 11.Oktober, so die Klägerin weiter, habe die Beklagte bestritten, eine zweite Menge von 9.000 mt zu schulden, mit der Begründung, die Klägerin habe die Lieferung von 15.000 mt abgelehnt und damit ihr Recht auf eine zweite Partie verwirkt.

Allerdings habe die Beklagte sich bereit erklärt, der Klägerin mit einer weiteren Abladung
behilflich zu sein, zu Marktbedingungen. Am 17. Oktober habe sie dann 9.000 mt angeboten
zum Preise von USD 250/mt ( statt der vereinbarten USD 142/t ; Anlage SB8). Dieses Ange-
bot habe sie nicht angenommen. Hätte sie es angenommen, wäre ihr zunächst ein Beschaf-
fungsaufwand in Höhe von USD 1.044.000 enstanden. Vermehrt um ihren entgangenen
Gewinn hätte sich ihr Schaden zusätzlich zur Klagsumme noch um USD 7.000 erhöht.

Die Verschiffung von „10.000 mts +/- 5%" mit dem MT „Sanmar Majesty" ( Anlage C6 ) zeige,
dass die Beklagte die zweite Lieferung an die Klägerin angesichts des gestiegenen Preises
für Schwefelsäure unterlassen habe. So habe der Anwalt der Klägerin in einem weiteren
Bemühen um eine gütliche Einigung die Beklagte aufgefordert, den Vertrag zu erfüllen, wid-
rigenfalls ihr angedroht, sich anderswo einzudecken ( Anlage C7 ).

Der folgende Schriftwechsel zwischen den Parteien sei erfolglos geblieben ( Anlagen C8,
C9, C10 ). Er habe geendet mit dem Schreiben der Klägerin vom 8. November 2007, worin
diese den Vertrag mit sofortiger Wirkung für beendet erklärt habe ( Anlage C11 ). Darauf
habe die Beklagte geantwortet ( Anlage C12 ) und sich mit Schiedsgerichtsbarkeit in Ham-
burg einverstanden erklärt.

Die Klägerin beziffert ihren durch diesen Vertragsbruch verursachten Schaden auf insgesamt
€ 758.904,40, nämlich auf  umgerechnet € 715.294,00 an IPSL gezahlten Schadensersatz
plus € 43.610,40 entgangenen Gewinn.

Nur unter großen Bemühungen – so die Klägerin weiter – sei es ihr gelungen, den Scha-
densersatzanspruch der IPSL von ursprünglich USD 1.692.900,00 ( Anlage C13 ) auf USD
1.100.000,00 herabzudrücken ( Anlage C14 ). Die entsprechende Rechnung der IPSL ( An-
lage C15 ), umgerechnet € 715.294,00 ( C17 ), habe sie am 16. Juni 2008 beglichen ( An-
lage C16 ). Außerdem fordere sie entgangenen Gewinn in Höhe von USD 63.000,00 ( 9.000
mt à USD 149/mt unter dem Vertrag Anlage C2 minus USD 142/mt unter dem Vertrag Ab-
lage C1 = USD 7.000/ mt ), umgerechnet € 43.610,40 ( Anlage C18 ). Addiert ergebe dies
€ 758.904,40.

Die Klägerin bezieht sich zum Beweise ihres Schadensersatzes  insbesondere auf e-mails,
die sie mit einigen Firmen gewechselt hat, welche ihrer Meinung nach belegen, dass sie sich
um Schadensminderung bemüht hat und dass diese Bemühungen erfolglos geblieben sind
( Anlagenkonvolut C20 ). Darauf wird in den Entscheidungsgründen näher eingegangen wer-
den.

Im übrigen verweist das Schiedsgericht auf die klägerischen Schriftsätze.

Demzufolge beantragt die Klägerin,

     die Beklagte zu verurteilen, ihr € 758.904,40 nebst 8% Jahreszinsen zu zahlen, auf
     € 43.610,40 ab 1.November 2007 und auf € 715.294,00 ab 16. Juni 2008, sowie die
     Kosten des Verfahrens.

Der Vortrag der Beklagten

Die Beklagte beantragt

Klagabweisung

und im Wege einer Eventualwiderklage,

die Klägerin zu verurteilen, an sie USD 55.889,60 nebst Zinsen in Höhe von 8%-Punkten über dem Basiszinssatz seit dem 29. November 2007 zu zahlen,

sowie

die Klägerin zum Tragen der Kosten dieses Schiedsverfahrens zu verurteilen.

Die Beklagte trägt vor:

Sie handele unter anderem mit Chemikalien und habe im Juli 2007 mit einem indischen Hersteller die Lieferung von 130.000 mt Schwefelsäure vereinbart, verteilt über gleich große Teillieferungen. Nach Abschluss dieses Liefervertrages habe sie mit der Klägerin den Vertrag Anlage C1 geschlossen. Mitte August habe ihr der Hersteller mitgeteilt, dass er auf Grund von Produktionsschwierigkeiten nicht liefern könne. Sie habe daher von ihm keine Lieferung erhalten. Von einem anderen indischen Hersteller habe sie dann ein Angebot über die Lieferung von 15.000 mt erhalten, Verladung Ende September 2007 und Auslieferung in Puerto Cabello Ende Oktober. Diese Lieferung habe sie der Klägerin am 3. September offeriert, welche sie angenommen habe, wie der Schriftwechsel zeige ( Anlagen C3, C4 = SB1 ). Die Klägerin habe darin um Nominierung des betreffenden Schiffes gebeten. Darauf habe sie der Klägerin den MT „Alessandro MP" ( sic ) für die vereinbarte Menge von 15.000 mt benannt. Frau Shams habe dabei verbindlich gehandelt, jedenfalls unter Duldungsvollmacht.

Sie, die Beklagte, sei sich selbstverständlich bewusst gewesen, dass auch die Klägerin nur Händlerin sei, also nicht Verwenderin der Ware. Zu keinem Zeitpunkt aber sei sie über einen konkreten Vertrag, dessen Konditionen oder den konkreten Kunden informiert worden. Den anders lautenden Vortrag der Klägerin bestreite sie. Ein notwendiges Einverständnis von dritter Seite sei ihr nicht bekannt gewesen. Die Anlage C4 = SB1 sei klar, werde darin doch ausdrücklich darauf hingewiesen, dass sowohl das „Hamburg office" als auch die „Venezuelans" informiert wurden und zugestimmt haben. Demzufolge sei vor Annahme des Angebots auch die venezolanische Kundin der Klägerin informiert worden, und sie sei mit der Änderung der vertraglichen Bedingungen einverstanden gewesen. Dass die Kundin der Klägerin insistiert hätte, mit zweimal 9.000 mt beliefert zu werden, sei ersichtlich nicht der Fall gewesen. Ob sie sich möglicherweise später umentschieden habe, entziehe sich ihrer, der Beklagten, Kenntnis. Nicht nachvollziehbar sei der Vortrag der Klägerin, ihre Kundin sei nicht bereit gewesen, auf 50% der Lieferung zu verzichten. Eine Vertragsänderung von 18.000 mt auf 15.000 mt bedeute eine Reduktion von lediglich rund 7,4%. Abgesehen von alledem habe eine e-mail der Klägerin vom selben Tage ( 3. September ) ergeben, das diese das avisierte Schiff akzeptiert habe.

Mit e-mail vom 3. September habe die Klägerin nunmehr auch ihrerseits um eine weitere Abänderung des Vertrages gebeten dahin, dass lediglich eine Lieferung von 9.000 mt statt 15.000 mt erfolgen möge, weil ihre Lagerkapazitäten nicht ausreichten ( Anlage C5, nicht: Anlage C6 ). Diesem Angebot der Klägerin nachkommend habe sie statt des MT „Alessandro MP" den MT „Havi Ocean" nominiert, der dann später durch den MT „Stolt Ami" ersetzt worden sei ( Anlage SB3 ). Dem habe die Klägerin nicht widersprochen.

Mit e-mail vom 17.10.2007 ( im Schriftsatz der Beklagten vom 24.10.2008 Seite 8 Mitte sind die Parteien vertauscht ) habe sie, die Beklagte, der Klägerin eine Partie von 9.000 mt ange-

Case 1:10-cv-03240-TPG    Document 1    Filed 04/16/2010    Page 38 of 67

SCHIEDSGERICHT DER HANDELSKAMMER HAMBURG                    Seite 8 von 15
Ameropa AG vs. Havi Ocean Co. (L.L.C.)

boten zum Preis von USD 250 mt ( Anlage SB8), was die Klägerin nicht akzeptiert habe.
Außerdem habe sie der Klägerin ein Gegenangebot unterbreitet zu USD 142 nebst einer
Einmalzahlung von USD 500.000. All dies hätte den Schaden der Klägerin begrenzt. Nach-
dem die Klägerin diese Vorschläge abgelehnt hatte, habe sie die 9.000 mt nach Namibia
verschifft.

Die Klägerin, so der Vortrag der Beklagten, habe ihren vermeintlichen Schaden nicht darge-
legt. Deshalb bestreitet die Beklagte, dass ein Schaden von USD 1.100.000 entstanden ist.
Sie bestreitet weiterhin, dass im vorliegenden Fall es wegen ausbleibender Lieferungen von
Schwefelsäure zu Stillständen in der Produktion gekommen ist. Auch bestreitet sie, dass die
Geschäftsbeziehung zwischen der Klägerin und der IPSL nach der Lieferung der ersten
9.000 mt belastet worden sei. Schließlich bestreitet sie, dass die IPSL einen Schadenser-
satzanspruch besaß. Insbesondere bestreitet sie die Höhe des angeblichen Schadens.

Sollte die Klägerin – so die Beklagte weiter - überhaupt Ersatz eines Schadens fordern kön-
nen,  müsse sie bei seiner Berechnung laut Vertrag Anlage C1 von einer Mindest-Liefer-
menge von 9.000 mt minus 5% ausgehen.

Auch die Zinsforderung der Klägerin  sieht die Beklagte als unberechtigt an, jedenfalls in ei-
ner Höhe von 8% Prozentpunkten über dem Basiszinssatz, da § 288 Abs. 2  BGB nur für
Entgeltforderungen und nicht für Schadensersatzforderungen gelte. Überdies könnten ihrer
Meinung nach Zinsen nicht schon ab 1.11.2007 beansprucht werden, da die Lieferung der
( bestrittenen ) zweiten Partie von 9.000 mt erst im Dezember 2007 hätte erfolgen sollen.

Die Beklagte ihrerseits beansprucht  von der Klägerin im Löschhafen Puerto Cabello bei der
ersten Lieferung 9.000 mt entstandenes Liegegeld in Höhe von USD 55.889,60 =
€ 43.610,40. Diesen Anspruch macht sie widerklagend geltend und hilfsweise im Wege der
Aufrechnung für den Fall, dass der Klaganspruch gegeben sein sollte.

Nach Vortrag der Beklagten sieht der Vertrag Anlage C1 „marine terms" vor, wonach die
Löschrate „80 mts per hour SHINC" beträgt ( „Sonn- und Feiertage eingeschlossen" ). Tat-
sächlich wurden aber nur 44,95 mt pro Stunde entladen. Dadurch, so begründet die Beklagte
ihre Forderung, habe sich die Abfertigung des Schiffes um 3 Tage, 11 Stunden und 50 Mi-
nuten ( 3,4931 Tage ) verzögert. Gemäss ihrer mit dem Schiffseigner vereinbarten Charter-
Party hätte sie diesem USD 18.500 pro Tag zu zahlen gehabt. Der Schiedsklägerin habe sie
jedoch ihrer vertraglichen Vereinbarung – entsprechend der Mitteilung vom 12.9.2007 An-
lage SB6 - am 29.11.2007 Liegegeld in Höhe von USD 16.000 pro Tag in Rechnung gestellt
( Anlage SB7, Laytime Calculation: Anlage SB4 ), also insgesamt USD 55.889,60.

Im übrigen verweist das Schiedsgericht auf den Inhalt der Schriftsätze der Beklagten.


Der Verlauf des Verfahrens

Die  Klage wurde der Beklagten am 10.9.2008 zugestellt und die  Eventualwiderklage der
Klägerin am 24.10.2008. Vor diesem Tage hatte die Beklagte die Aufrechnung mit ihrer Ge-
genforderung nicht erklärt.  Am 15. Januar 2009 fand eine mündliche Verhandlung statt. Die
Parteien waren sich darüber einig, dass bis dato eine gütliche Einigung unter ihnen nicht
möglich gewesen sei, so dass nun das Schiedsgericht entscheiden müsse. Daran hat sich
seitdem nichts geändert.

Nach der mündlichen Verhandlung ist ein Vergleich außergerichtlich nicht zustande gekom-
men. Einer Verlängerung der laut Protokoll vom 15.1.2009 gesetzten Vergleichsfrist hat das
Schiedsgericht nicht zugestimmt, da anders als im Protokoll vorgesehen nur eine der Par-
teien dies beantragt hatte. Die Parteien haben sodann fristgerecht schriftlich zum Ergebnis
der mündlichen Verhandlung Stellung genommen. Anschließend hat das Schiedsgericht mit

SCHIEDSGERICHT DER HANDELSKAMMER HAMBURG

Ameropa AG vs. Havi Ocean Co. (L.L.C.)

Seite 9 von 15

Fax vom 20.2.2009 das „closing of the proceedings" angeordnet. Am 24.2.2009 ging dann ein Schriftsatz der Beklagten ein, den das Schiedsgericht mit Fax vom 26.2.2009 als verspätet zurückwies. Darauf antwortete die Beklagte am 26.2.2009 und bat um Erläuterung des Begriffes „closing of the proceedings": Die für das Schiedsgerichtsverfahren vereinbarte Sprache sei die deutsche.

## Entscheidungsgründe

### Zuständigkeit des Schiedsgerichts

Das Schiedsgericht ist zuständig, den vorliegenden Streit zu entscheiden. Dies ergibt sich aus der „Dispute"-Klausel des zwischen den Parteien vereinbarten Vertrages Anlage C1. Eine gütliche Lösung zwischen Ihnen ist nicht zustande gekommen. Darüber sind sich die Parteien auch einig, wie das Protokoll vom 15.1.2009 bestätigt.

### Zum Vortrag der Parteien

Die Parteien, insbesondere die Beklagte, hatten ausreichend Gelegenheit, zur Sache vorzutragen.

Vor der mündlichen Verhandlung hat jede von ihnen zahlreiche Schriftsätze eingereicht; in der mündlichen Verhandlung wurde der Streitfall ausgiebig diskutiert; danach bestand zunächst innerhalb einer bestimmten Frist die Möglichkeit, außergerichtlich einen Vergleich auszuhandeln, wobei, falls beide Parteien es wünschten ( was indessen nicht der Fall war ), das Schiedsgericht diese Verhandlungsfrist verlängert hätte. Nach Ablauf dieser Frist lief eine andere Frist, innerhalb derer beide Seiten zum Ergebnis der mündlichen Verhandlung Stellung genommen haben. Anschließend hat das Schiedsgericht am 20.2.2009 das „closing of the proceedings" angeordnet. Einen danach eingereichten Schriftsatz der Beklagten vom 24.2.2009 hat das Schiedsgericht als verspätet zurückgewiesen. Darauf hat die Beklagte am 26.2.2009 vortragen lassen, das Schiedsgericht möge den Begriff „closing of the proceedings" erläutern.

Dieser Begriff wird in Schiedsverfahren üblicherweise gebraucht. Die allseits bekannten DIS-Verfahrensregeln enthalten ihn in Art. 31 ihrer deutschen und in ihrer englischen Fassung, ebenso wie die ICC Rules in ihrem Art. 22. Der deutsche Ausdruck heißt: „Beendigung des Erkenntnisverfahrens".

Abgesehen davon haben die Parteien in diesem Verfahren einvernehmlich sowohl die deutsche als auch die englische Sprache benutzt. Sie haben gestritten über englisch geschriebene Verträge und Korrespondenz; sie haben ausnahmslos zur Sache englischsprachige Anlagen vorgelegt ( die Klägerin 20 und die Beklagte 13 an der Zahl ). Dies entspricht § 15 des Regulativs der Handelskammer Hamburg, wonach die Parteien die Verfahrenssprache bestimmen. Dabei ist der Vortrag der Klägerin zwar widersprüchlich: In ihrer Klage (Ziffer 42) stellt sie fest, dass die Gerichtssprache deutsch sei; gleichwohl hat sie sämtliche Anlagen ohne Übersetzung in Englisch vorgelegt. Für einen Streit zwischen schweizer, arabischen und südamerikanischen Beteiligten dürfte es indessen selbstverständlich sein, sich auch englisch auszudrücken. Nach alledem muss daher das Schiedsgericht davon ausgehen, dass der Beklagten und ihren Verfahrensbevollmächtigten die Bedeutung des „closing of the proceedings" jedenfalls bekannt sein konnte. Abgesehen davon dies auch deshalb, weil schon vorher mitgeteilt worden war, dass das Schiedsgericht nach Ablauf der Schriftsatzfrist eine schriftliche Entscheidung erlassen würde ( Protokoll vom 15.1.2009 ).

<u>Zur Klage und Widerklage</u>

Der Klaganspruch ist in der Höhe von insgesamt € 720.216,03 begründet. Den restlichen eingeklagten Betrag kann die Klägerin nicht fordern.

Dieser Betrag setzt sich ( zunächst ohne Zinsen ) wie folgt zusammen:

| | |
|---|---:|
| Schadensersatz wegen Nichtlieferung der zweiten Partie von 9.000 mt: | € 715.294,00 |
| Schadensersatz wegen entgangenen Gewinns: | €  43.610,40 |
| gleich | € 758.904,40 |
| Gegenanspruch der Beklagten auf Zahlung von Liegegeld: Minus | €  38.688,37 |
| mithin insgesamt | € 720.216,03. |

(1) <u>Schadensersatz wegen Nichtlieferung von 9.000 mt.</u>

Dieser Ersatzantrag beträgt USD 1.100.000, unstreitig umgerechnet ( Anlage C17 Seite 1 ) € 715.294,00. Er ist bei unstreitiger Anwendung deutschen Rechts ( vgl. auch § 16 Abs. 2 des Regulativs des Schiedsgerichts der Handelskammer Hamburg ) nach § 280 Abs. 1 und 3, § 281 Abs. 1 Satz 1 und Abs. 2 BGB begründet. Denn die Beklagte hat die nach dem Vertrag Anlage C1 geschuldete zweite Partie Schwefelsäure nicht geliefert. Dabei brauchte die Klägerin der Beklagten für diese Lieferung keine Frist zu setzen, da diese sich spätestens bei der Zürcher Besprechung und nochmals durch Schreiben ihrer Anwälte aus Dubai ( Anlage C10 ) „ernsthaft und endgültig" zu liefern geweigert hatte. Ihr „Nicht-vertreten-müssen" ( § 280 Abs. 1 Satz 2 BGB ), etwa wegen des Eintritts höherer Gewalt oder dergleichen, hat die Beklagte nicht geltend gemacht. Im Gegenteil, wie sie selbst vorträgt, standen ihr weitere 9.000 mt zur Verfügung, die sie der Klägerin angeboten hatte, allerdings zu einem höheren als dem vereinbarten Kaufpreis ( nämlich Einkaufspreis von USD 140/mt zuzüglich Verschiffungs- und sonstige Kosten, so dass sich ein Gesamtpreis von USD 258 errechnete ). Diesen brauchte die Klägerin indessen nicht zu akzeptieren, weil sie sich auf ihren Vertrag stützen konnte. Dass die Marktpreise für Schwefelsäure zwischenzeitlich gestiegen waren ( wie die Beklagte vorträgt ), lag im Risikobereich der Beklagten. Dazu im einzelnen:

(a) Die behaupteten Vertragsänderungen.

Die Beklagte hat die zweite Partie Schwefelsäure nicht geliefert, obschon sie dazu nach dem Vertrag Anlage C1 verpflichtet war. Dieser Vertrag ist entgegen dem Vortrag der Beklagten nicht abgeändert worden. Die Beklagte beruft sich zunächst zu Unrecht auf den in den Anlagen C3 und C4/SB1 geführten Schriftwechsel zwischen ihr und der Angestellten der Klägerin in Kairo, Frau Abeer Shams. Sie liest aus der Anlage C3 ein Vertragsangebot heraus. Dieses stellt diese e-mail jedoch nicht dar. Denn sie spricht lediglich vom „Versuch" der Beklagten, Ladung zu bekommen. Dieser Versuch ( obendrein ) bezieht sich auf eine Ladungsmenge von lediglich 15.000 mt. Nicht gesprochen wird darüber, dass die Klägerin bei einmal statt zwei Verladungen von je 9.000 mt lediglich 15.000 mt erhalten soll. Auch das Verladedatum für den „Versuch" stimmte mit dem ursprünglichen Datum „Oktober" nicht überein. Zu verhandeln wäre mit Sicherheit gewesen, was der Ausfall einer Menge von 3.000 mt Schwefelsäure nach sich zieht, ebenso wie über die nochmalige Verschiebung der Lieferfrist. Für Verträge wie für Willenserklärungen gilt, dass sie so auszulegen sind, „wie Treu und Glauben mit Rücksicht auf die Verkehrssitte" es erfordern ( § 157 BGB ). Ein internationaler Händler wie die Klägerin hätte in der e-mail Anlage C3 kein Vertragsangebot gesehen. Unabhängig davon bedeutet die Antwort der Frau Shams ( Anlagen C4 = SB1 ) auch keine Annahme eines Angebotes. Zugegebenermassen überrascht Frau Shams'ens Antwort, wenn sie sagt: „We will nominate a 15000 mt vessel today, shipment end September". Laut Vertrag war es die Beklagte, die ein Schiff zu nominieren hatte; und „end September" entsprach auch nicht dem Vertrag. Schließlich sagte Frau Shams, „I have advised Hamburg office"; und dies zeigt, dass sie dieses Büro unterrichtet hat, und wohl auch, dass sie dieses

Büro unterrichten musste. Daran ändert auch nichts der letzte Satz in Frau Shams' e-mail ( Anlage C4/SB1 ): „As agreed I am waiting for your nomination today asap". Ihre e-mail stand erkennbar unter dem Vorbehalt, dass sie zunächst „Hamburg" unterrichte. Sie selbst hatte also keine Vollmacht, ein Geschäft abzuschließen. Schließlich hat die Beklagte auch nicht begründet, warum Frau Shams unter einer Duldungsvollmacht gehandelt haben sollte. Die Gespräche an diesem Tage waren damit aber noch nicht abgeschlossen. Noch am selben Tage leitete sodann Frau Shams die inzwischen erhaltene Nachricht der IPSL Anlage C5 weiter, aus der sich ergibt, dass dieser Abnehmer mit dem Vorschlag der Beklagten nicht einverstanden war: „But we definitely need to load maximum 9.000 mts." Die später erhaltene Nominierung des MT „Alessandro DP" durch die Beklagte ( Anlage SB2 ) geht damit ins Leere. Die erste von der Beklagten behauptete Vertragsänderung ist mithin nicht schlüssig dargelegt.

Die Beklagte behauptet eine zweite Vertragsänderung, und zwar eine von der Klägerin gewünschte. Aber auch diese Änderung ist nicht schlüssig dargelegt. Sie argumentiert nämlich, die Klägerin habe auf die Lieferung von 15.000 mt verzichtet und nur noch auf einer Menge von insgesamt 9.000 mt bestanden. Dies, so trägt sie vor, ergebe sich aus der e-mail der Klägerin Anlage C5 ( sie spricht irrtümlich von C6 ). Dieser Vortrag ist nicht begründet, schon deshalb, weil keine Vertragsänderung von zweimal 9.000 mt auf 15.000 mt zustande gekommen war. Die Anlage C5 selbst, auf die sich die Beklagte bezieht, ergibt keine Vertragsänderung. Diese e-mail erweist eindeutig, dass IPSL auf der Lieferung von zweimal 9.000 mt bestand: „Seeing Havi can swap our and EFIC's cargoes then the possibility to load only 9kt by end Sept for us and the balance 6kt to ship it beg Oct together with our original 9kt", was auch für EFIC „workable" sein würde. Die e-mail ergibt zwar auch, dass der venezolanische Abnehmer gegen den Einsatz des Tankers "Alessandro DP" nichts einzuwenden hatte, vorausgesetzt allerdings, dessen Ladung von 15.000 mt würde zwischen ihm und einer Firma EFIC wie erwähnt aufgeteilt. Erläutert wird schließlich darin auch, dass IPSL im Löschhafen lediglich eine Menge von 9.000 mt löschen und lagern konnte. Nach allem hat mithin die Klägerin keine Vertragsänderung gewünscht und beantragt.

(b) Der behauptete Schaden von USD 1.100.000

Durch die Nichtlieferung von 9.000 mt hat die Klägerin zunächst einen Schaden in Höhe von € 715.294 erlitten, weil sie ihrerseits ihrem Abnehmer unter dem Vertrag Anlage C2 Schadensersatz schuldete. Sie hat zwar keinen Deckungskauf vorgenommen, kann aber ihren Schaden konkret auch in anderer Weise berechnen. Sie hat ihrem Abnehmer, der IPSL, Schadensersatz für die Nichterfüllung des Vertrages Anlage C2 gezahlt, und zwar USD 1.100.000 im Gegenwert von € 715.294. Dies beruhte dem Grunde nach das Schreiben der IPSL, welches sowohl von IPSL als auch von der Klägerin unterschrieben ist ( Anlage C14 ). Dies belegen zusätzlich IPSL's Rechnung ( Anlage C15 ), IPSL's Empfangsbestätigung des Betrages ( Anlage C16 ) und die Bestätigung des Umrechnungskurses ( Anlagen C17 und C18 ). An der Korrektheit und der Begründetheit dieser Zahlung kann das Schiedsgericht nicht zweifeln. Die Beklagte hat die Höhe des Schadens zwar bestritten. Indessen ist dieses Bestreiten insgesamt unsubstantiert. Das Bestreiten, dass ein Schaden von USD 1.100.000 entstanden ist, ist pauschal; der Vertrag Anlage C2 zeigt, dass die Klägerin ihrem Abnehmer gegenüber vertragsbrüchig geworden ist; das von beiden Parteien des genannten Vertrages unterzeichnete Schreiben Anlage C14 hat die Beklagte nicht konkret in Frage gestellt; ebenso wenig hat sie sich konkret mit der Rechnung ( Anlage C15 ), der Empfangsbestätigung ( Anlage C16 ) und der Bestätigung des Umrechnungskurses ( Anlagen C17 ) auseinandergesetzt. Das Schiedsgericht muss daher zunächst von einem Schaden von € 715.294 ausgehen.

Die folgenden Überlegungen zeigen zusätzlich, dass die Klägerin zu Recht den Betrag von USD 1.100.000 an die IPSL gezahlt hat. Auch danach liegt nämlich der von IPSL

erlittene Schaden über - und nicht unter - der geleisteten Entschädigung von USD 1.100.000.

IPSL verlangt, um dies nochmals festzuhalten, von der Klägerin als Schadensersatz wegen teilweiser Nichterfüllung ihres Vertrages Anlage C2 die Differenz zwischen ihrem Deckungsgeschäft mit einem Dritten ( „tercero" ) und dem von der Klägerin nicht erfüllten Grundgeschäft. Das Schiedsgericht musste sich auch mit diesem Schaden der IPSL auseinandersetzen, weil er die Voraussetzung des eigenen Schadens der Klägerin bildet.

Dieser Differenzbetrag ergibt sich aus folgender Rechnung:

USD 280/mt mal 9.000 mt gleich    USD 2.520.000
USD 149/mt mal 9.000 mt gleich    USD 1.341.000
also                              USD 1.179.000.

Dabei geht das Schiedsgericht bei dieser Berechnung von einem Tonnenpreis von USD 280 aus, wie sogleich erläutert werden wird.

Laut Anlage C20 ( letzte Seite, Kästchen ) soll sich diese Differenz ergeben bei jeweils einer Tonnenzahl von 9.000 mt plus einer Toleranz von 10% bei einem Preise von

„AMEROPA 9.000 mt +/./. 10% ..... USD 149/mt  = USD 1.475.100
Tercero    9.000 mt +/./. 10% ..... USD 320/mt  = USD 3.168.000",
Differerenz also                                 USD 1.692.900.

Diese Endzahlen sind aber falsch, da sie von 9.000 mt plus 10% ausgehen. Von der Erhöhung der Liefermenge kann die Beklagte nämlich nicht ausgehen, da diese Option nur von der Klägerin und von der IPSL ausgeübt werden konnte, was indessen nicht der Fall war: „Shipping tolerance in buyer's option" ( Anlage C1 Seite 1, ebenso wie Anlage C2 Seite 1 ).

Die IPSL will an „Tercero" USD 320/mt gezahlt haben. Die Klägerin hat ihr USD 1.100.000 erstattet, also pro Tonne USD 1.100.000 geteilt durch 9.000 mt gleich USD 122,22. Wenn IPSL tatsächlich USD 320 pro Tonne gezahlt und von der Klägerin USD 122,22 erhalten hat, bliebe also eine Differenz von USD 320 minus USD 122,22 gleich USD 197,78. Dies würde bedeuten, dass IPSL trotz der von der Klägerin erhaltenen USD 122,22 immer noch einen Schaden in Höhe von USD 197,78 pro Tonne erlitten hätte. Dass IPSL dies akzeptiert hätte, hält das Schiedsgericht für unwahrscheinlich.

Das Schiedsgericht hat daher untersucht, welchen Tonnen-Preis IPSL seinem Lieferanten „Tercero" gezahlt haben könnte, und zwar durch folgende Annäherungs-Rechnungen:

|      | 320    | 300    | 280    | 260    | 270    |
|------|--------|--------|--------|--------|--------|
| ./.  | 122,22 | 122,22 | 122,22 | 122,22 | 122,22 |
|      | 197,78 | 177,78 | 157,78 | 137,78 | 147,78. |

Sie zeigen, dass der von IPSL seinem Lieferanten gezahlte Preis jedenfalls in der Nähe von USD 270/mt, genau genommen etwas darüber gelegen haben muss.

Das Schiedsgericht rechnet weiter: USD 149 plus USD 122,22 ergeben den Mindest-Einkaufspreis, den IPSL, um ohne Schaden dazustehen, hätte zahlen können, also USD 271,22 pro Tonne. Der echte Preis – und das zeigt der unumstrittene Vortrag beider Seiten zur Marktlage - lag darüber. Die Beklagte selbst hatte - wie erwähnt - einen Marktpreis von USD 250/mt angeboten.

Das Schiedsgericht schätzt den von IPSL erlittenen Schaden auf USD 280/mt, analog § 287 Abs, 1 Satz 1 ZPO. Man darf nämlich vermuten, dass „Tercero" die schwierige Marktlage für sich ausgenutzt hat.

Selbst die Beklagte kommt zu einem jedenfalls fast annähernden Ergebnis. Der von ihr genannte Marktpreis von „etwas mehr als USD 258/mt" ergäbe bereits fast einen Schaden von

| | |
|---|---|
| USD 258/mt mal 9.000 mt gleich | USD 2.322.000 |
| minus 9.000 mt mal USD 149/mt gleich | USD 1.341.000 |
| also | USD   981.000, |

mithin einen Betrag, der dem von der Klägerin an IPSL gezahlten Betrag sehr nahe kommt.

(c) Schadensminderung

Die Klägerin hat sich, anders als es die Beklagte behauptet, bemüht, ihren Schaden gering zu halten. Das Schiedsgericht geht davon aus, dass Ende Oktober 2007 der „market (...) very short" war, wie die polnische Firma Interchem Trading p.l. am 29.10.2007 der Ameropa Düngemittel GmbH berichtete ( Anlage C20 Seite 1 ). Auch das Angebot der Beklagten, zu USD 250/mt zu liefern, belegt dies. Aus dem Schriftwechsel lässt sich auch ersehen, dass Schwefelsäure mit der von IPSL gewünschten Qualität damals nicht verfügbar war ( Anlage C20 Seite 2 ). Weitere e-mails belegen, dass erfolglose Gespräche über Lieferungen stattgefunden haben ( Anlagen C20 Seiten 4 und 5 ). Selbst aus Korea konnte keine Ware geliefert werden ( Anlage C20 Seite 6 ). Dass die mit Schriftsatz der Beklagten vom 19.2.2009 vorgelegten Marktberichte Anlage SB12 irgendeine Aussagekraft hätten, kann das Schiedsgericht nicht erkennen, da sie über das Geschehen im Jahre 2009 berichten. Abgesehen davon wird darin nichts über Lieferungen aus Indien oder dem Iran berichtet, was aber die Verträge Anlagen C1 und C2 fordern. Die Anlage SB 13 konnte, da verspätet vorgelegt, nicht berücksichtigt werden.

Die Klägerin hat auch, und zwar mit Erfolg, mit IPSL über deren Ersatzanspruch verhandelt. Davon muss das Schiedsgericht auf Grund der vorgelegten Anlagen ausgehen, welche die Beklagte auch nicht substantiiert bestritten hat. Ursprünglich hatte IPSL nämlich von der Klägerin Schadensersatz in Höhe von USD 1.692.900 gefordert. Dies ergibt sich aus der Rechnung Anlage C13 und aus einer e-mail von Jeffry Carreno vom 28.1.2008 ( Anlage C20 Seite 8 ). Darin berichtete er über eine Ersatzlieferung eines Dritten an IPSL ( letzteres ergibt sich aus Anlage C13 ) zum Preise von USD 320/mt. Die Preisdifferenz zu USD 147/mt unter dem Vertrag Anlage C2 beträgt USD 171/mt, für 9.000 mt also USD 1.692.900. Gegen diese erste Rechnung der IPSL vom 28. Januar 2008 über USD 1.692.900 ( Anlage C13 ) hat sich die Klägerin gewehrt und darüber verhandelt, wie das gemeinsam unterzeichnete Schreiben Anlage C14 vom 15. Mai 2008 zeigt.

Die Klägerin brauchte sich auf die Vergleichsangebote der Beklagten nicht einzulassen. Eine Einmalzahlung von € 500.000 liegt unter ihrem tatsächlichen Schaden. Auch das Angebot vom 17. Oktober 2007 brauchte die Klägerin nicht anzunehmen: 8.100 mt zum Preis von USD 250/mt ( Anlage SB8 ). Zunächst einmal ist der Faktor 8.100 mt falsch, wie bereits erläutert. Zum andern: Wäre die Klägerin auf das Angebot eingegangen, hätte sie vorab der Beklagten auf Basis 9.000 mt USD 2.250.000 zahlen müssen. Sie hätte zwar von der IPSL anschließend pro Tonne USD 149 erhalten. Angesichts der getroffenen Vereinbarung Anlage C1 brauchte sie sich darauf nicht einzulassen. Dies war ihr nicht zuzumuten.

(d) Die Zinsforderung

Die Klägerin fordert auch Zinsen, und zwar in Höhe von pauschal jährlich 8% ab 16. Juni 2008. Eine Mahnung war nicht erforderlich, da die Zeit für die Lieferung kalendermäßig festlag: November 2007 ( § 286 Abs. 2 Ziffer 1 ). Eine Schadensersatzforderung ist aber keine „Entgeltforderung", was § 288 BGB für acht Prozentpunkte voraussetzt. Der Verzugszinssatz über dem Basiszinssatz beträgt daher nur  fünf Prozentpunkte. Die Klägerin geht allerdings von einer pauschalen Berechnung aus, lässt also den Basiszinssatz außer acht. Folglich ist die Zinsforderung nur berechtigt in Höhe des variablen Basiszinssatzes laut § 247 plus 5 %. Allerdings liegt die Höchstgrenze für die geforderten Zinsen gemäss dem Antrag der Klägerin bei 8%. Die Zinszeit beginnt mit dem 17.6.2008, einen Tag nachdem die Klägerin die IPSL entschädigt hatte. Eine Mahnung war nicht erforderlich, da die Zeit für die Lieferung kalendermäßig festlag: November 2007 ( § 286 Abs. 2 Ziffer 1 )  Der Basiszinssatz betrug an diesem Tage 3,32%, ab 1.7.2008 3,19%; ab 1.1.2009 beträgt er 1,82%.


(2) Entgangener Gewinn der Klägerin

Die Klägerin ist berechtigt, von der Beklagten entgangenen Gewinn in Höhe von € 43.610,40 nebst Zinsen zu fordern.

Dies ergibt sich aus den §§ 247, 252, 276, 280, 288 BGB. Unstreitig besteht der entgangene Gewinn aus der Differenz zwischen den Kaufpreisen unter den beiden Verträgen Anlagen C1 und C2. Diese beträgt USD 149/mt minus USD 142/mt gleich USD 7/mt mal 9.000 mt gleich USD 63.000 und unstreitig umgerechnet € 43.610,40. Dabei haben weder der Käufer IPSL noch die Klägerin von der Option einer Erhöhung oder Verminderung der Kaufmenge Gebrauch gemacht. Der Verzugszinssatz beträgt den Basiszinssatz plus, da es sich auch hier nicht um eine „Entgeltforderung" handelt,  fünf Prozentpunkte.

Die Zinszeit beginnt am 1.12.2007  Über sie besteht Streit. Nach Meinung der Klägerin beginnt sie am 1.11.2007: „2nd lot with loading  l/c November 2007". Dagegen  wendet sich mit Recht die Beklagte. Es fragt sich, wann die Klägerin den Kaufpreis für die zweite Ladungsmenge erhalten hätte. Zahlen hätte IPSL unter dem Vertrag Anlage C2 müssen nur dann, falls die Beklagte ihrerseits geliefert hätte.  Dazu hatte sie laut Vertrag Anlage C1 indessen Zeit bis zum 30.11.2007. Eine Mahnung war nicht erforderlich, weil nach Auffassung des Schiedsgerichts „aus besonderen Gründen unter Abwägung der beiderseitigen Interessen der sofortige Eintritt des Verzuges gerechtfertigt" war ( § 286 Abs. 2 Ziffer 4 ). Denn zu dieser Zeit hatte sich die Beklagte bereits in Zürich geweigert, auch die zweite Partie zu liefern.


(3) Gegenforderung der Beklagten

Die Beklagte fordert Liegegeld in Höhe von USD 55.889,60. Diesen Antrag hat sie in der mündlichen Verhandlung gestellt ( so auch Seite 12 der Klagbeantwortung, anders als dort auf Seite 11 ). Dies entspricht bei unbestrittenem Kurs USD 55.889,60 mal € 0,6922285 also € 38.688,37. Die Beklagte hat in ihrem Schriftsatz vom 24.10.2008 Seite 12 für den Fall einer begründeten Klage die Aufrechnung mit diesem Gegenanspruch erklärt. Die Klägerin hat diese Forderung nicht bestritten und auch keinen die Widerklage betreffenden Antrag gestellt. Damit brauchte sich das Schiedsgericht mit dieser Forderung nicht auseinanderzusetzen. Die Aufrechnung ist am Tage der Zustellung der Widerkläge, dem 24.10.2008 ( so das Protokoll der mündlichen Verhandlung ), wirksam geworden ( § 388 BGB ). Die darauf bezogene Zinsforderung ist damit gegenstandslos geworden.

(4) <u>Zinsen- und Kostenregelung</u>

Bei der Verzinsung der stattgegebenen Klagforderungen hat das Schiedsgericht die begrün-
dete Gegenforderung der Beklagten von der Hauptforderung der Klägerin abgezogen, weil
der Anspruch auf Zahlung des entgangenen Gewinns erst später als der Hauptanspruch ent-
standen ist.

Das Schiedsgericht legt im Einvernehmen mit den Parteien den Streitwert auf € 758.904,40
fest. Dabei berücksichtigt es nicht § 45 GKG entsprechend den Betrag der Widerklage.

Die Kosten des Schiedsverfahrens und der außergerichtlichen Kosten fallen den Parteien
entsprechend dem Verhältnis Obsiegen / Unterliegen zur Last, also € 758.904 : €
720.216,03. Dies bedeutet, dass die Beklagte 95% dieser Kosten trägt und die Klägerin 5%.
Die betragsmäßige Verteilung wird durch das Schiedsgericht der Handelskammer Hamburg
erfolgen.

Hamburg ( Ort des Schiedsgerichts ), den 25. März 2009

( Ulf Becker )          ( Axel Bartels )          ( Dr. Johannes Trappe )

# Exhibit 4

Certified translation from the German language

l.s.: Hanseatic Upper District Court, 26

[coat of arms]

# HANSEATIC UPPER DISTRICT COURT

## Court Order

| | |
|---|---|
| File no.:<br>**13 Sch 5/09** | Passed on:<br>Sept. 15, 2009<br>Bandow<br>Judicial Employee as Registrar<br>of the Court's Registry |

### In the arbitration matter of

**Havi Ocean Co. (L.L.C.),**
represented by Saeed Daneshmand, its managing director,
Office 204, Al Rais Building, SK. K. Bin Zayed Road, Opp. Burjuman,
P.O. Box 29061, Dubai, United Arab Emirates

- Petitioner -

Attorneys of record:                    Dabelstein & Passehl, Attorneys at Law,
                                         Große Elbstrasse 36, 22767 Hamburg    GK 202
                                         (565/08 XI/XVII/NA)

v e r s u s

**Ameropa AG,**
represented by Felix Zivy,
Andreas Zivy, Marcus Damman, Charles Waffenschmidt,
Jan Kadanik and Nicole Miescher-Zivy, its Board of Directors,
Rebgasse 108, H-4102 Binningen, Switzerland,

- Defendant -

Attorneys of record:                    Lehmann, Attorneys at Law,
                                         Mönckebergstrasse 11, 20095 Hamburg,

the Hanseatic Upper District Court, **Civil Division 13**, represented by the judges

          Panten,                 Löffler,                    zur Verth,

held the oral proceedings on September 08, 2009 and

HELD DECREED AND DETERMINED:

in Hamburg and consisting of the arbitrators Ulf Becker, Axel Bartels and Dr. Johannes Trappe passed the following arbitration award in the arbitration proceedings between the Petitioner as respondent and the Defendant as claimant:

The respondent is sentenced to pay to the claimant an amount of EUR 720,216.03 (sevenhundredandtwentythousand and twohundredandsixteen Euros and three Cents).

In addition, the respondent is sentenced to pay to the claimant the following interests per annum: on the amount of EUR 676,605.63, the applicable basic interest rate plus 5% as from June 17, 2008, and on the amount of EUR 43,610.40, the applicable basic interest rate plus 5% as from December 1, 2007, in both cases, however, not more than 8%.

And finally, the respondent is sentenced to bear 95% of the costs of the arbitration proceedings and the extrajudicial costs while the claimant shall bear 5% of said costs.

The further claims forming a subject matter of the statement of claim as well as the interest claims asserted by the respondent shall be dismissed.

The value in dispute amounts to EUR 758,904.40.

2.)   Said arbitration award, as reproduced above, is hereby declared enforceable.

3.)   The petition of the Petitioner to reverse the arbitration award is hereby dismissed.

4.)   The costs of these proceedings shall be borne by the Petitioner.

5.)   This judgment shall be provisionally enforceable.

6.)   The value of the matter is set at EUR 758,904.40.

I.

In August 2007, the Parties concluded a contract about the delivery of sulphuric acid and agreed upon the jurisdiction of the Arbitration Tribunal of the Chamber of Commerce in Hamburg in the case of disputes; according to their agreement, said Tribunal was to decide according to its Rules.

When implementing the contract, the Defendant was represented by Ameropa Düngemittel GmbH (private ltd. liability company), its subsidiary in Hamburg. The sulphuric acid was not to be delivered directly from the United Arab Emirates but from India or the Iran to the final consumer in Venezuela.

By statement of claim (<u>Annex AG 2</u>), the Defendant instituted arbitration proceedings with the above-mentioned Tribunal and submitted that German substantive law was to be applied. At the same time, the Defendant appointed Mr. Becker, presiding judge at the District Court, as the arbitrator to be nominated by it.

In its reply dated October 24, 2008 (<u>Annex AG 4</u>) as well as in its statement of case of December 23, 2008 (<u>Annex AG 5</u>), the Petitioner relied on rules of the German civil law, namely Sections 288 and 814 of the German Civil Code.

According to the minutes of the oral proceedings (<u>Annex AG 3</u>) held before the Arbitration Tribunal on January 15, 2009, it was discussed there whether the presiding judge at the District Court Becker could have been appointed as arbitrator with legally binding effect when taking Section 40 paragraph 1 of the German Judiciary Act into account. Both Parties "explicitly" declared "in a joint statement to place every confidence in the arbitrator Ulf Becker, presiding judge at the District Court, that he will, in his capacity as associate arbitrator, be adapting an impartial approach during arbitration proceedings".

On March 25, 2009, the Arbitration Tribunal passed the arbitration award the wording of which has been reproduced above and, with respect to the facts of the case, applied German substantive law.

The Petitioner alleges that a joint appointment of Mr. Becker as arbitrator as well as an agreement upon the application of German law was explicitly refused by it during the oral proceedings.

The Petitioner believes that with respect to the provisions set forth in Section 40 paragraph 1 of the German Judiciary Act it was not admissible to grant Mr. Becker, presiding judge at the District Court, a permission to perform a secondary activity because the judge was appointed by the Defendant rather than by an independent body or both Parties in common and that, consequently, the Arbitration Tribunal was established incorrectly within the meaning of 1059 paragraph 2 number 1d, 1 Alt. Code of Civil Procedure; apart from that, so the Petitioner, it was not known to it whether such a permission to perform a secondary activity had been issued with legal effect at all.

In addition, the Petitioner is of the opinion that the facts of the case would have had to be determined according to the law of the United Arab Emirates because the Petitioner who had been entrusted with the activities typical for such a contract was resident there. Against said background, so the Petitioner, the application of German law represents a reason to reverse the arbitration award according to Section 1056 paragraph 2 no. 1d, 2. Alt. Code of Civil Procedure.

The Petitioner applies

to reverse the arbitration award passed by the Arbitration Tribunal of the Chamber of Commerce of Hamburg in the legal dispute between Ameropa AG versus Havi Ocean Co. (L.L.C.) on March 25, 2009 pursuant to Section 1959 of the Code of Civil Procedure.

The Defendant applies

to dismiss the Petitioner's application and to declare the arbitration award passed by the Arbitration Tribunals of the Chamber of Commerce of Hamburg in the legal dispute between Ameropa AG versus Havi Ocean Co. (L.L.C.) on March 25, 2009 enforceable pursuant to Section 1060 of the Code of Civil Procedure.

The Petitioner applies

to dismiss the Defendant's application according to Section 1060 of the Code of Civil Procedure.

The Defendant believes that the statement of the Parties included in the minutes constitutes a joint appointment of Mr. Becker; as to the rest, it states that the judicial authority of Hamburg had in fact granted the permission to perform a secondary activity for Mr. Becker.

The Defendant continues to submit that the Arbitration Tribunal was right when applying German law and that the behavior of the Parties during proceedings could be construed as an implied agreement between them.

1.) According to Section 1062 paragraph 1 Code of Civil Procedure in conjunction with Section 20 of the Rules of the Arbitration Tribunal of the Chamber of Commerce, the review and decisions of the submitted applications falls within the jurisdiction of the Hanseatic Upper District Court.

2.) The Petitioner's application for reversal of the arbitration award must be dismissed for lack of any reason to reverse according to Section 1059 of the Code of Civil Procedure.

a) The Arbitration Tribunal was, within the meaning of Section 1059 paragraph 2 no. 1d, 1. Alt. Code of Civil Procedure, not incorrectly established.

In this connection, it may be left open whether the arbitrator Becker had in fact been granted a permission to perform a secondary activity or whether the Petitioner, too, had given him a mandate as arbitrator when confirming its confidence in his impartiality during the oral proceedings.

The Division is of the opinion that an infringement of Section 40 paragraph 1 sentence 1 of the German Judiciary Act does not result in an incorrect establishment of the arbitration tribunal (and this is deemed to be the prevailing opinion; cf. Lachmann, Handbuch der Schiedsgerichtspraxis (Manual of Arbitration Practice), 3rd ed. 2008, m.n. 860 - 862 with numerous other evidences).

The question whether a professional judge appointed as arbitrator has (validly) been granted a permission to perform a secondary activity does not affect the legal system applicable to the parties of the arbitration tribunal. Section 40 paragraph 1 sentence 1 of the German Judiciary Act specifies the official duties of the judge and primarily provides for the protection of the operability of state-administered justice. With respect to the interests of the parties who, in each case, intend to appoint a competent and impartial arbitrator it is completely irrelevant whether a permission to perform a secondary activity has been granted.

And specifically in the matter on hand, this becomes definitely evident because the Petitioner, too, expressed its confidence in the arbitrator in spite of having doubts with respect to his valid permission to perform a secondary activity - and it can scarcely be demonstrated more clearly that, also from the Petitioner's viewpoint, this issue did not have any effect upon the proper approach by Mr. Becker.

Furthermore and as a general rule it is to be noted that a lack or an improper issue of a permission to perform a secondary activity must not be to the disadvantage of the parties (Upper District Court of Stuttgart NJW-RR, 2003, 495, 498) who are unable to exert any

influence upon the underlying procedure but, as the case may be, would be forced to bear the consequences of a lack of a permission to perform a secondary activity in the event of a different interpretation.

Contrary to the Petitioner's opinion, the provisions set forth in Section 40 paragraph 1 sentence 1 of the German Judiciary Act, are not pointless when interpreted this way: the obligation of the administrative authority to refuse a permission in cases like here remains unaffected. There is no doubt that a professional judge who fails to obtain a permission for a secondary activity would not be allowed to be assigned to the position of an arbitrator. These duties do exist irrespective of whether they are complied with in a specific individual case - but it must not be the parties of arbitration proceedings who have to bear the sanction imposed in case of an infringement of these public law duties. Whether this would have to be assessed differently within the scope of application of Section 40 paragraph 1 sentence 1 of the German Judiciary Act may remain unanswered because a prior involvement or a possible later involvement of the arbitrator Becker was not given.

The decision BGHZ 55, 313, 319/320 (Law Reports of the Federal Court of Justice in Civil Matters), as relied on by the Petitioner, does not differ from what has been said above: on the one hand, the Federal Court of Justice only mentions the possibility of a voidness in case of a lack of a permission for a secondary activity in its decision passed a long time ago rather than deciding upon said issue (and thus, we do not even have to do with an *obiter dictum* here). On the other hand, the Federal Court of Justice is far from letting fail the effectiveness of a settlement agreed upon before the relevant arbitration tribunal due to a lack of such a permission or its improper granting within the meaning of Section 40 paragraph 1 sentence 2 of the German Judiciary Act; thus, the decision relied upon by the Petitioner does not have any consequences for the decision to be made in the case on hand.

b)  The Arbitration Tribunal was right when applying German substantive law and a reason for reversal pursuant to Section 1059 paragraph 2 no. 1d, 2. Alt. Code of Civil Procedure in conjunction with Section 16 paragraph 2 of the Rules of the Arbitration Tribunal of the Chamber of Commerce of Hamburg does not exist.

Taking a combined view of Section 16 paragraphs 1 and 2 of the Rules, it is absolutely certain that the applicable law primarily depends on the law elected by the parties. According to general regulations, however, said choice of law may also be made by implication rather than explicitly (cf. Section 27 paragraph 1 sentence 2 EGBGB (Introductory Law to the German Civil Code) only).

There are so many indicators here which pointed to a choice of German law and exactly the German Civil Code (by simultaneously excluding the CISG according to its Section 6) that the Civil Division has no doubt at all that the Parties came to a corresponding implied agreement in this respect.

It was by agreement between the Parties that German law was elected and proceedings were subjected to a body of rules drawn up in Germany. Said body of rules refers to the provisions set forth in the German Code of Civil Procedure (Section 17 paragraph 1 of the Rules) to be applied additionally; as competent state court, the Hanseatic Upper District Court was chosen (Section 20 of the Rules).

Eventually, it is decisive that the Petitioner not only failed to repudiate the arguments brought forward by the Defendant on the basis of German law (sub-clause 41 of the statement of claim, Annex AG 2) but even substantiated its own submissions by referring to the provisions of the German Civil Code (Sections 288 and 814 of the German Civil Code). And it is exactly such a behavior of parties during proceedings that constantly points to a choice of law (Federal Court of Justice, NJW 2004, 2523, m.n. 25 - cited according to juris). There is no indication at all that the Parties were to interpret the behavior of the respective other Party otherwise than in the sense of an agreement to German law; in particular, it is not possible to follow the Petitioner's reasoning according to which the legal dispute - in the sense of Section 16 paragraph 2 of the Rules - actually showed close links to the law of the United Arab Emirates with the result that during the preparation of the oral proceedings during which the relevant statements of case were exchanged doubts about the agreement to apply German law could have had been detected. As a matter of fact, the link to the law of Dubai is extremely weak because this is exactly not the state from which the performance in kind was to be supplied actually; instead, the sulphuric acid was to be shipped from a third state.

All that said, it may be left open whether the Petitioner had rejected an explicit agreement on German law during the oral proceedings before the Arbitration Tribunal because at that point of time a legally effective agreement already existed and a corresponding statement to such an effect cannot be taken as a contestation (that, by the way, can be deemed to have been made behind schedule).

As a matter of fact, German law would have had to be applied even if there had been a link according to Section 16 paragraph 2 of the Rules (in conjunction with the principles of Section 28 of the EGBGB to be called on analogously) - the arrangement on presumption set forth in Section 28 paragraph 2 of the EGBGB, on which the Petitioner relies, cannot really have an effect due to the closer connection to the German law within the meaning of

Section 28 paragraph 5 EGGVG. Possible links or connections are so disparate and the relation to Dubai is so weak that even an objectifying provision of the legal system to be applied leads to German substantive law (cf. Section 16 paragraph 1 sentence 2 of the Rules): the sulphuric acid to be delivered was destined for a company in Venezuela which, for this purpose, had approached the Claimant and thus a company in Switzerland. True, the supplier has its place of business in Dubai, but as place of origin of the sulphuric acid, Iran or India, and as place of shipment, a port there was agreed upon; on behalf of the Petitioner, an office in Cairo became active. What is more, a shipment from Namibia was - at least temporarily - a subject matter of discussions. In view of such a diversity of conceivable links and connections, the strongest relationship to a certain legal system is established by means of an agreement to German law and this is all the more true because the Defendant's subsidiary carrying out the transaction had its place of business in Hamburg, a fact the choice of the place of jurisdiction was obviously based upon.

3.) As no other reasons for a reversal within the meaning of Section 1059 paragraph 2 no. 1 of the Code of Civil Procedure were submitted and no reasons within the meaning of Section 1059 paragraph 2 no. 2 of the Code of Civil Procedure are evident the arbitration award submitted by the Defendant in its original version is to be declared enforceable.

4.) The assessment of costs is based upon Section 91 paragraph 1 of the Code of Civil Procedure and the determination of a provisional enforceability upon Section 1064 paragraph 2 of the Code of Civil Procedure. The determination of value is derived from Sections 3 Code of Civil Procedure, 48, 63 of the Court Fees Act.

l.s.: Hanseatic Upper District Court, Hamburg, 26

Panten                              Löffler                        zur Verth

l.s.: Hanseatic Upper District Court, Hamburg, 26


Executed
[signature]
Registrar of the Court's Registry

---

*This is to certify the completeness and fidelity of the preceding translation of the attached German document.*
*Place: Telgte*
*Date: March 24, 2010*






EINGEGANGEN

2 2. SEP. 2009

LEHMANN · Rechtsanwälte

# HANSEATISCHES OBERLANDESGERICHT
## Beschluss

Geschäftszeichen:
**13 Sch 5/09**

Verkündet am:
15.09.2009
Bandow
Justizangestellte als
Urkundsbeamtin der
Geschäftsstelle.

**In der Schiedssache**

**Havi Ocean Co. (L.L.C.),**
vertreten durch den Managing Director Saeed Daneshmand,
Office 204, Al Rais Building, SK. K. Bin Zayed Road, Opp. Burjuman,
P.O. Box 29061, Dubai, Vereinigte Arabische Emirate

- Antragstellerin -

Prozessbevollmächtigte/r:    Rechtsanwälte Dr. Dabelstein & Passehl ,
Große Elbstraße 36, 22767 Hamburg    GK 202
(565/08 XI/XVII/NA)

**g e g e n**

**Ameropa AG,**
vertreten durch den Verwaltungsrat Felix Zivy,
Andreas Zivy, Marcus Damman, Charles Waffenschmidt,
Jan Kadanik und Nicole Miescher-Zivy
Rebgasse 108, CH-4102 Binningen, Schweiz

- Antragsgegnerin -

Prozessbevollmächtigte/r:    Rechtsanwälte Lehmann,
Mönckebergstraße 11, 20095 Hamburg

beschließt das Hanseatische Oberlandesgericht Hamburg, **13. Zivilsenat**,
aufgrund der mündlichen Verhandlung vom 08.09.2009 durch die Richter

Panten,                Löffler,            zur Verth:

1.) Das in Hamburg tagende Schiedsgerichts der Handelskammer Hamburg, bestehend aus den Schiedsrichtern Ulf Becker, Axel Bartels und Dr. Johannes Trappe erließ am 25.03.2009 im zwischen der Antragstellerin als Beklagter und der Antragsgegnerin als Klägerin geführten Schiedsverfahren den folgenden Schiedsspruch.

> Die Beklagte wird verurteilt, der Klägerin € 720.216,03 (Euro siebenhundertzwanzigtausend zweihundertsechzehn und drei Cent) zu zahlen.

> Außerdem wird sie verurteilt, der Klägerin folgende Zinsen pro anno zu zahlen: Auf € 676.605,63 den jeweils geltenden Basiszinssatz plus 5% ab 17.06.2008 und auf € 43.610,40 den jeweils geltenden Basiszinssatz plus 5% ab 1.12.2007, in beiden Fällen jedoch höchstens 8%.

> Schließlich wird die Beklagte verurteilt, 95% der schiedsgerichtlichen und außergerichtlichen Kosten der Klägerin zutragen, während die Klägerin 5% dieser Kosten tragen muss.

> Die weitergehende Klage wird abgewiesen, ebenso wie die Zinsforderung der Beklagten.

> Der Streitwert beträgt € 758.904,40.

2.) Dieser Schiedsspruch wird wie unter Ziffer 1 wiedergegeben für vollstreckbar erklärt.

3.) Der Antrag der Antragstellerin auf Aufhebung des Schiedsspruchs wird zurückgewiesen.

4.) Die Kosten dieses Verfahrens fallen der Antragstellerin zur Last.

5.) Dieses Urteil ist vorläufig vollstreckbar.

6.) Der Gegenstandswert wird auf € 758.904,40 festgesetzt.

<u>Gründe</u>

I.

Die Parteien schlossen im August 2007 einen Vertrag über die Lieferung von Schwefelsäure und vereinbarten hierbei für Streitigkeiten die Zuständigkeit des Schiedsgerichts der Handelskammer Hamburg, das nach seinem Regulativ entscheiden sollte.

Für die Antragsgegnerin handelte bei der Abwicklung des Vertrages ihr Hamburger Tochterunternehmen Ameropa Düngemittel GmbH. Die Schwefelsäure sollte nicht direkt aus den VAE geliefert, sondern vielmehr aus Indien oder dem Iran an den Abnehmer in Venezuela verschifft werden.

Mit statement of claim (Anl. AG 2) erhob die Antragsgegnerin Schiedsklage zum vorbenannten Gericht und trug hier vor (sub Ziff. 41), dass deutsches Sachrecht auf den Fall anzuwenden sei. Zugleich benannte die Antragsgegnerin als von ihr ernennenden Schiedsrichter Herrn VRiLG Becker.

In ihrer Replik vom 24.10.2008 (Anl. AG 4) sowie ihrem Schriftsatz vom 23.12.2008 (Anl. AG 5) bezog sich die Antragstellerin auf Normen des deutschen Zivilrechts nämlich §§ 288 und 814 BGB.

In der mündlichen Verhandlung vor dem Schiedsgericht am 15.01.2009 wurde ausweislich des Protokolls (Anl. AG 3) diskutiert, ob im Hinblick auf § 40 Abs. 1 DRiG VRiLG Becker wirksam als Schiedsrichter habe bestellt werden können. Beide Parteien erklärten „gemeinsam ausdrücklich, dass sie dem Schiedsrichter Herrn VRiLG Hamburg Ulf Becker das Vertrauen entgegenbringen, er werde auch als beisitzender Schiedsrichter unparteiisch am Schiedsverfahren mitwirken".

Am 25.03.2009 erließ das Schiedsgericht den im Tenor wiedergegebenen Schiedsspruch, wobei es auf den Sachverhalt deutsches Sachrecht anwandte.

Die Antragstellerin behauptet, in der mündlichen Verhandlung eine gemeinsame Beauftragung von Herrn Becker als Schiedsrichter und zudem auch eine Einigung auf die Anwendung deutschen Rechts ausdrücklich abgelehnt zu haben.

Sie ist der Auffassung, dass im Hinblick auf die Regelung des § 40 Abs. 1 DRiG Herrn VRiLG Becker, da er von der Antragsgegnerin und nicht einer neutralen Stelle oder beiden Parteien gemeinsam berufen worden sei, eine Nebentätigkeitsgenehmigung - vor der ihr i.Ü. unbekannt sei, ob sie bestandskräftig ergangen sei – nicht habe erteilt werden dürfen, womit das Schiedsgericht im Sinne des 1059 Abs. 2 Nr. 1d, 1. Alt. ZPO fehlerhaft gebildet worden sei.

Weiter vertritt sie die Auffassung, dass der Sachverhalt nach dem Recht der VAE zu entscheiden gewesen sei, da die vertragstypische Leistung durch die dort ansässige Antragstellerin zu erbringen gewesen sei. Die Anwendung deutschen Rechts begründe daher den Aufhebungsgrund gem. § 1059 Abs. 2 Nr. 1d, 2. Alt. ZPO.

Sie beantragt,

> den Schiedsspruch des Schiedsgerichts der Handelskammer Hamburg in dem Rechtsstreit Ameropa AG gegen Havi Ocean Co. (L.L.C.) vom 25. März 2009 gem. § 1059 ZPO aufzuheben.

Die Antragsgegnerin beantragt,

> den Antrag der Antragstellerin zurückzuweisen und
> den Schiedsspruch des Schiedsgerichts der Handelskammer Hamburg in dem Rechtsstreit Ameropa AG gegen Havi Ocean Co. (L.L.C.) vom 25. März 2009 gem. § 1060 ZPO für vollstreckbar zu erklären.

Die Antragstellerin beantragt,

> den Antrag der Antragsgegnerin gem. § 1060 ZPO zurückzuweisen.

Die Antragsgegnerin ist der Auffassung, dass in der zu Protokoll erfolgten Parteierklärung eine gemeinsame Beauftragung von Herrn Becker liege; zudem habe die Justizbehörde Hamburg Herrn Becker tatsächlich eine Nebentätigkeitsgenehmigung erteilt.

Das Schiedsgericht habe zu Recht deutsches Recht angewandt, im Prozessverhalten der Parteien sei eine konkludente Vereinbarung in diesem Sinne zu sehen.

II.

1.) Das HansOLG ist gem. 1062 Abs. 1 ZPO i.V.m. § 20 des Regulativs des Schiedsgerichts der Handelskammer für die Bescheidung der vorliegenden Anträge zuständig.

2.) Der Aufhebungsantrag der Antragstellerin ist zurückzuweisen, da ein Aufhebungsgrund gem. § 1059 ZPO nicht vorliegt.

a) Die Bildung des Schiedsgerichts war nicht fehlerhaft im Sinne des § 1059 Abs. 2 Nr. 1d, 1. Alt. ZPO.

Dabei kann dahinstehen, ob dem Schiedsrichter Becker tatsächlich eine Nebentätigkeitsgenehmigung erteilt worden war oder ob mit der Erklärung des Vertrauens in seine Unparteilichkeit in der mündlichen Verhandlung auch die Antragstellerin ihm einen Schiedsrichterauftrag erteilt hat.

Nach Auffassung des Senats führt ein Verstoß gegen § 40 Abs. 1 S. 1 DRiG nicht zu einer fehlerhaften Bildung des Schiedsgerichts (so wohl auch die h.M. vgl. Lachmann, Handbuch der Schiedsgerichtspraxis, 3. Aufl. 2008, Rn. 860 – 862 mit zahlreichen weiteren Nachweisen).

Die Frage, ob einem zum Schiedsrichter bestellten Berufsrichter eine Nebentätigkeitsgenehmigung (rechtmäßig) erteilt wurde, berührt den Rechtskreis der Parteien des Schiedsgerichts nicht. § 40 Abs. 1 S. 1 DRiG regelt Dienstpflichten des Richters und dient in erster Linie dem Schutz der Funktionsfähigkeit der staatlichen Rechtspflege. Für das Interesse der Parteien, das darauf gerichtet ist, im Einzelfall einen kompetenten und unbefangenen Schiedsrichter zu benennen, ist die Erteilung der Nebentätigkeitsgenehmigung vollständig irrelevant.
Dies zeigt sich gerade vorliegend deutlich darin, dass auch die Antragstellerin, obwohl sie Zweifel an der wirksamen Erteilung einer Nebentätigkeitsgenehmigung hatte, dem Schiedsrichter gleichwohl ihr Vertrauen aussprach – deutlicher kann kaum dokumentiert werden, dass auch aus ihrer Sicht diese Frage ohne jeden Einfluss auf eine sachgerechte Behandlung des Verfahrens durch Herrn Becker war.

Zudem darf schon grundsätzlich das Fehlen oder auch die rechtswidrige Erteilung einer Nebentätigkeitsgenehmigung nicht zu Lasten der Parteien gehen (OLG Stuttgart NJW-RR, 2003, 495, 498), die keinerlei Einfluss auf das zu Grunde liegende Verfahren nehmen können, bei einer anderen Bewertung aber ggf. die Folgen des Fehlens einer Nebentätigkeitsgenehmigung tragen müssten.

Entgegen der Auffassung der Antragstellerin läuft die Regelung des § 40 Abs. 1 S. 1 DRiG bei dieser Auslegung auch nicht leer: An der Verpflichtung der Dienstbehörde, in Fällen der vorliegenden Art eine Genehmigung nicht zu erteilen ändert sich nicht. Unzweifelhaft dürfte ein Berufsrichter, dem die Nebentätigkeitsgenehmigung aus diesem Grunde versagt würde, das Schiedsrichteramt nicht übernehmen. Diese Pflichten bestehen, unabhängig davon, ob sie in einem konkreten Einzelfall beachtet wurden – die Sanktion für die Verletzung dieser öffentlich-rechtlichen Pflichten kann jedoch nicht die Parteien eines Schiedsgerichtsverfahrens treffen. Ob dies im Anwendungsbereich des § 40 Abs. 1 S. 2 DRiG anders zu beurteilen wäre, kann hier dahinstehen, da hinsichtlich des Schiedsrichters Becker ein Fall der Vorbefassung oder der möglichen späteren Befassung nicht gegeben war.

Aus der von der Antragstellerin in Bezug genommenen Entscheidung BGHZ 55, 313, 319/320 folgt nichts anderes: Zum einen erwähnt der BGH in dieser weit zurückliegenden Entscheidung nur die Möglichkeit einer Nichtigkeit bei Fehlen der Nebentätigkeitsgenehmigung, entscheidet diese Frage aber gerade nicht (womit nicht einmal ein obiter dictum vorliegt). Zum anderen lässt er jedenfalls die Wirksamkeit eines vor dem fraglichen Schiedsgericht geschlossenen Vergleichs gerade nicht am Fehlen der Nebentätigkeitsgenehmigung bzw. deren nach § 40 Abs. 1 S. 2 DRiG rechtswidrigen Erteilung scheitern, womit aus diesem Urteil nichts für die vorliegende Entscheidung abgeleitet werden kann.

b)  Das Schiedsgericht hat mit deutschem Sachrecht auch das richtige Recht angewandt, ein Aufhebungsgrund gem. § 1059 Abs. 2 Nr. 1d, 2. Alt. ZPO i.V.m. § 16 Abs. 2 des Regulativ des Schiedsgerichts der Handelskammer Hamburg liegt nicht vor.

Aus der Zusammenschau von § 16 Abs. 1 und Abs. 2 des Regulativs ergibt sich zweifelsfrei, dass das anzuwendende Recht vorrangig durch eine Rechtswahl der Parteien bestimmt werden kann. Diese aber kann nach allgemeinen Regeln

gerade nicht nur ausdrücklich, sondern auch konkludent erfolgen (vgl. nur Art. 27 Abs. 1 S. 2 EGBGB).

Hier liegen so viele Umstände vor, die auf eine Wahl deutschen Rechts – und zwar des BGB (unter gleichzeitigem Ausschluss des CISG gem. dessen Art. 6) – hindeuten, dass der Senat an einer entsprechenden konkludenten Einigung der Parteien keinerlei Zweifel hat.

Die Parteien haben einverständlich ein deutsches Forum gewählt und den Prozess einem in Deutschland abgefassten Regelwerk unterstellt. Dieses Regelwerk verweist ergänzend auf die Bestimmungen der deutschen ZPO (§ 17 Abs. 1 des Regulativs), als zuständiges staatliches Gericht wurde das HansOLG bestimmt (§ 20 des Regulativs).

Entscheidend ist schließlich, dass die Antragstellerin sich gegen die Argumentation der Antragsgegnerin aus deutschem Recht (sub Ziff. 41 des „statement of claim", Anl. AG 2) nicht nur nicht verwahrt, sondern vielmehr sogar selbst ebenfalls unter Verweis auf Normen des deutschen Bürgerlichen Gesetzbuchs (§§ 288 und 814 BGB) argumentiert hat. Gerade einem solchen Verhalten der Parteien im Prozess kann jedoch regelmäßig eine Rechtswahl entnommen werden (BGH NJW 2004, 2523, Rz. 25 – zitiert nach juris). Nichts spricht dafür, dass hier etwa die Parteien das Verhalten der jeweils anderen Seite anders als im Sinne einer Einigung auf deutsches Recht interpretieren mussten; insbesondere kann der Argumentation der Antragstellerin nicht gefolgt werden, dass der Rechtsstreit tatsächlich im Sinne des § 16 Abs. 2 des Regulativs enge Verbindungen zum Recht der VAE aufweise, woraus sich im Stadium der Vorbereitung der mündliche Verhandlung, in dem die fraglichen Schriftsätze gewechselt wurden, u.U. Zweifel an einer Vereinbarung deutschen Rechts hätten ergeben können. Tatsächlich ist die Verbindung zum Recht von Dubai äußerst schwach, da die Sachleistung faktisch gerade nicht von dort aus erbracht werden, sondern die Verschiffung der Schwefelsäure aus einem Drittstaat erfolgen sollte.

Damit kann dahinstehen, ob die Antragstellerin in der mündlichen Verhandlung vor dem Schiedsgericht eine ausdrückliche Vereinbarung deutschen Rechts abgelehnt hat, da zu diesem Zeitpunkt eine wirksame Einigung bereits erfolgt war und einer entsprechenden Erklärung eine Anfechtung (die zudem verfristet gewesen sein dürfte) nicht entnommen werden kann.

Tatsächlich hätte hier auch eine Anknüpfung nach § 16 Abs. 2 des Regulativs (i.V.m. mit den analog heranzuziehenden Grundsätzen des Art. 28 EGBGB) zur Anwendung deutschen Rechts geführt – die von der Antragstellerin herangezogene Vermutungsregel des Art. 28 Abs. 2 EGBGB kann nicht eingreifen, da eine engere Verbindung im Sinne des Art. 28 Abs. 5 EGBGB zum deutschen Recht besteht. Die möglichen Anknüpfungspunkte sind so disparat, die Verbindung nach Dubai so schwach, dass auch eine objektivierende Bestimmung der anzuwendenden Rechtsordnung zu deutschem materiellem (vgl. § 16 Abs. 1 S. 2 des Regulativs) Recht führt: Die zu liefernde Säure war für ein Unternehmen in Venezuela bestimmt, das bei der Klägerin, also einem schweizerischen Unternehmen, anfragte. Sitz der Lieferantin ist zwar Dubai, als Herkunftsort der Säure wurde jedoch Iran oder Indien, als Verschiffungsort ein dortiger Hafen vereinbart; für die Antragstellerin handelte ein Büro in Kairo. Schließlich stand zumindest zeitweise auch eine Verschiffung nach Namibia in Diskussion. Bei diesen vielfältigen denkbaren Anknüpfungen wird die stärkste Beziehung zu einer bestimmten Rechtsordnung durch die Vereinbarung eines deutschen Forums geschaffen, zumal – woraus diese Gerichtsstandsvereinbarung sich offenbar herleitete – die das Geschäft abwickelnde Tochterunternehmung der Antragsgegnerin seinen Sitz in Hamburg hatte.

Auch diese objektivierende Anknüpfung führt im Übrigen nicht zur Anwendung des CISG, da die VAE nicht Mitglied dieses Abkommens sind (vgl. Palandt-Thorn, Bürgerliches Gesetzbuch, 68. Aufl. 2009, Art. 28 RGBGB, Rn. 8), wobei zudem die fehlerhafte Anwendung deutschen Rechts ohnehin nicht über § 1059 Abs. 2 ZPO gerügt werden könnte.

3.) Da weitere Aufhebungsgründe im Sinne des § 1059 Abs. 2 Nr. 1 ZPO nicht geltend gemacht wurden und solche im Sinne des § 1059 Abs. 2 Nr. 2 ZPO nicht ersichtlich sind, ist der im Original vorgelegte Schiedsspruch auf Antrag der Antragsgegnerin für vollstreckbar zu erklären.

4.) Die Kostenentscheidung beruht auf § 91 Abs. 1 ZPO, der Ausspruch zur vorläufigen Vollstreckbarkeit auf § 1064 Abs. 2 ZPO. Die Wertfestsetzung folgt aus §§ 3 ZPO, 48, 63 GKG.



Panten                    Löffler                    zur Verth

Ausgefertigt

# Exhibit 5

*Certified Translation from the German Language*

Copy

[coat of arms]

# FEDERAL COURT OF JUSTICE

## COURT ORDER

<u>III ZB 78/09</u>                              [receipt stamp: Jan. 19, 2010
                                          Lehmann, Attorneys at Law]

dated
January 14, 2010

In the proceedings for declaration of enforceability of an arbitration award

Havi Ocean Co. (L.L.C.), represented by Saeed Daneshmand, its managing director, Office 204, Al Rais Building, SK.K. Bin Zayed Road, Opp. Burjuman, P.O. Box 29061, Dubai, United Arab Emirates

- Petitioner and Appellant -

- Attorneys of record:                    Dr. von Plehwe and Schäfer,
                                          Attorneys at Law

v e r s u s

Ameropa AG, represented by Felix Zivy, Andreas Zivy, Marcus Damman, Charles Waffenschmidt, Jan Kadanik and Nicole Miescher-Zivy, its Board of Directors, Rebgasse 108, H-4102 Binningen, Switzerland,

- Defendant and Appellee -

Attorneys of record
for the first instance:                   Lehmann, Attorneys at Law,
                                          Mönckebergstrasse 11, Hamburg,

the Civil Division III of the Federal Court of Justice, represented by its Vice President Schlick and the judges Dörr, Dr. Herrmann, Seiters and Tombrink,

HELD DECREED AND DETERMINED:

Having withdrawn its appeal against the court order passed by the Hanseatic Upper District Court of Hamburg, Civil Division 13, on September 15, 2009 - 13 Sch 5/09 - the Petitioner is hereby deprived of this remedy.

The costs of the appeal shall be borne by the Petitioner (pursuant to Section 516 paragraph 3 Code of Civil Procedure).

Value in dispute: EUR 758,904.40


Schlick                          Dörr                        Herrmann


           Seiters                              Tombrink


                              Executed:
                              [signature]
                              (Kiefer)
                              Judicial Employee
                              Registrar of the Registry of the
                              Federal Court of Justice

l.s.: Federal Court of Justice

---

*This is to certify the completeness and fidelity of the preceding translation of the attached German document.*
*Place: Telgte*
*Date: March 24, 2010*

Ausfertigung



# BUNDESGERICHTSHOF

## BESCHLUSS

III ZB 78/09

vom

14. Januar 2010



in dem Verfahren auf Vollstreckbarerklärung eines Schiedsspruchs

Havi Ocean Co. (L.L.C.), vertreten durch den Managing Director Saeed Daneshmand, Office 204, Al Rais Bulding, SK.K. Bin Zayed Road, Opp. Burjuman, P.O. Box 29061, Dubai, Vereinigte Arabische Emirate,

Antragstellerin und Rechtsbeschwerdeführerin,

- Verfahrensbevoll-
mächtigte:

Rechtsanwälte Dr. von Plehwe und Schäfer -

gegen

Ameropa AG, vertreten durch den Verwaltungsrat Felix Zivy, Andreas Zivy, Marcus Damman, Charles Waffenschmidt, Jan Kadanik und Nicole Miescher-Zivy , Rebgasse 108, CH-4102 Binningen, Schweiz,

Antragsgegnerin und Rechtsbeschwerdegegnerin,

- Verfahrensbevoll-
mächtigte I. Instanz:

Lehmann Rechtsanwälte, Mönckebergstraße 11, Hamburg -

Der III. Zivilsenat des Bundesgerichtshofs hat am 14. Januar 2010 durch den Vizepräsidenten Schlick und die Richter Dörr, Dr. Herrmann, Seiters und Tombrink

beschlossen:

Die Antragstellerin wird, nachdem sie die Rechtsbeschwerde gegen den am 15. September 2009 verkündeten Beschluss des Hanseatischen Oberlandesgerichts Hamburg, 13. Zivilsenat, - 13 Sch 5/09 - zurückgenommen hat, dieses Rechtsmittels für verlustig erklärt.

Die Kosten der Rechtsbeschwerde werden ihr auferlegt (§ 516 Abs. 3 ZPO entsprechend).

Streitwert: 758.904,40 €

Schlick                          Dörr                          Herrmann

                Seiters                          Tombrink

Ausgefertigt:

(Kiefer)
Justizangestellter
als Urkundsbeamter der Geschäftsstelle
des Bundesgerichtshofs